*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0317p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RHODA GRIZZELL, et al.,

     *Plaintiffs-Appellants,*

  *v.*

CITY OF COLUMBUS DIVISION OF POLICE, et al.,

     *Defendants-Appellees.*

No. 05-3026

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 02-00883—Edmund A. Sargus, Jr., District Judge.

Argued: November 30, 2005

Decided and Filed: August 25, 2006

Before: GUY and GIBBONS, Circuit Judges; EDMUNDS, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Samuel N. Lillard, MOWERY & YOUELL, Dublin, Ohio, for Appellants. Paula J. Lloyd, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees. **ON BRIEF:** Samuel N. Lillard, Dianne D. Einstein, MOWERY & YOUELL, Dublin, Ohio, for Appellants. Paula J. Lloyd, Pamela J. Gordon, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees.

_____

**OPINION**

_____

  JULIA SMITH GIBBONS, Circuit Judge. Plaintiffs-appellants, twelve Caucasian male and four Caucasian female officers of the Columbus Police Department ("CPD"), claim that they were denied promotions to the rank of sergeant on account of their race and gender. Plaintiffs brought suit against the City of Columbus's Division of Police and CPD Chief James G. Jackson, alleging that they were discriminated against in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and Ohio law. Plaintiffs argue that Jackson, who is an African-American male, chose to promote nine officers to the rank of sergeant using a 1999 eligibility list rather than a 2001 eligibility list because the use of the 1999 list ensured the promotion of three African-American officers. Despite intricate civil service rules regulating the CPD's promotional

---

  [*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

process, plaintiffs claim that Jackson effectively manipulated the civil service rules by choosing the timing of the decision to promote. The district court granted defendants' motion for summary judgment. Plaintiffs timely appealed. For the following reasons, we affirm the district court's decision.

I.

In November 2001, the CPD promoted nine officers to the rank of sergeant. Promotions to the rank of sergeant are subject to Columbus's civil service rules, the Columbus city charter, Ohio law, and the union contract between the city and the Fraternal Order of Police ("FOP"). The process of promotion involves numerous steps. To begin the process, the CPD determines that a vacancy exists. If there is a vacancy, the police chief generally has the discretion to fill a position or to leave the position vacant. The police chief also has the discretion to decide when to fill the vacancy. Once the police chief decides to fill a vacancy, the CPD submits a "request for certification," which defines the type and number of positions available, to the Department of Public Safety ("DPS"). The Director of the DPS is the legal "appointing authority" for any CPD promotions under the civil service rules. The DPS director may approve the request for certification and forward it to the Civil Service Commission ("CSC"). Upon receipt of the request for certification, the CSC certifies a sufficient number of candidate names to fill the vacancies.

Candidates are certified for promotion in order of their ranking on a preexisting "eligibility list." The officers are ranked on the eligibility list according to a combination of their seniority and scores on a required civil service exam. Each eligibility list is valid for only two years. Candidates who remain on an eligibility list when that list expires, but who wish to be considered for future promotions, must retake the civil service exam. The certified candidates are then ranked on a "certification list" in the same order that they appeared on the active eligibility list. The CSC sends this certification list back to the DPS. The candidates on the certification list then undergo a PACE (Promotional, Assessment, Career Evaluation) review to ensure that they are suitable for promotion. If the PACE review reveals an area of concern, the candidate may be required to attend an interview with a PACE reviewing board. The police chief receives a copy of the final PACE review. After consideration of the PACE review, the police chief recommends candidates from the certification list for promotion. The DPS director then reviews the police chief's recommendations and appoints chosen individuals.

In the fall of 2001, nine CPD sergeants were activated to military duty as a result of their reserve status following the terrorist attacks of September 11, 2001. The record reflects that, by the middle of October, there were already eight sergeant vacancies as a result of the call-ups. During the months of September, October, and November, Jackson held executive staff meetings with his deputy chiefs in order to determine whether to replace those sergeants on military leave.

The "1999 eligibility list" was set to expire on November 30, 2001, at which point the "2001 eligibility list" would become the active eligibility list. Deputy Chief Stephen Gammill testified that, in late October or early November, he had a conversation with Deputy Chief Gary Thatcher, who administers the promotional process for the CPD. Gammill claims that he told Thatcher that, if promotions were to be made in November 2001, the decision of which list to use should be made prior to the release of the 2001 eligibility list to avoid the appearance of impropriety. Gammill also claims to have advised Thatcher to wait for the new list because there would be higher quality candidates at the top of the 2001 list as opposed to number 50 through 59 on the 1999 list. Gammill further testified that, a few days after his initial conversation with Thatcher, Thatcher told Gammill that Thatcher had spoken with Jackson and that Jackson had decided to use the 2001 list to fill any vacancies. Thatcher testified on the other hand that he has no recollection of telling Gammill that Jackson had decided to use the 2001 list.

In November 2001, Jackson told Mitchell Brown, the DPS director, that there was a need to make promotions to sergeant. Brown agreed with Jackson's inclination. Brown asked Brooke Carnevale, a DPS human resource officer, to investigate promotional options. Carnevale investigated the idea of "limited promotions," which allow for the promotion of officers to rank of sergeant in a limited capacity. If a sergeant returns from military duty, the limited sergeant is demoted back to his original officer position. The demoted officer can then petition for reinstatement; if the petition is granted, his name is placed at the top of the new eligibility list notwithstanding his score on the civil service exam. If a sergeant on military duty does not return and the limited sergeant remains in the post for one year, the limited sergeant automatically loses the limited status and becomes a regular sergeant. Carnevale presented the limited promotion option to Brown and Thatcher, and Thatcher in turn relayed the limited promotion option to Jackson. Although limited promotions had never before been used for promotions to the "sworn ranks" of sergeant, lieutenant, commander, or deputy chief, Carnevale explained to Thatcher that using limited promotions was ideal in the case of military call-ups because of the potential for extended absences and uncertain dates of return. Moreover, the limited-promotion option would allow all of the sergeant vacancies to be filled without exceeding the authorized number of total sergeants. Jackson concurred that limited promotions should be used. Brown testified that he told Jackson that appointments would be made from the 1999 eligibility list. Jackson and Thatcher both testified that Jackson directed Thatcher, sometime between November 17 and 19, to proceed with the limited promotions.

On November 19, 2001, the 2001 eligibility list was made public, and Jackson called the top ten police officers on the new list to congratulate them. After the new list was made public, Jackson met with Thatcher to discuss the promotions. Thatcher testified that Jackson was in a "decision-making mode" during the meeting. Thatcher testified that he and Jackson discussed the fact that the timing of the request to fill vacancies would affect whether the 1999 or 2001 list would be used. Thatcher told Jackson that using the old list would allow three African-American officers to be promoted to sergeant. Thatcher suggested that this was an opportunity to diversify the rank of sergeant. Jackson and Thatcher discussed the three African-American officers on the 1999 list. No other potential candidates, including those on the 2001 list, were discussed at that time.

Commander Jay Evans, who manages the CPD's personnel department, testified that, on November 19, 2001, Thatcher directed him to make the official request for certification. On November 20, 2000, the CPD submitted its request for certification to the DPS. The request for certification was for nine limited promotions to the rank of sergeant. On November 21, 2001, Carnevale sent the request for certification for the nine limited promotions to the CSC, which received it on November 26, 2001. The CSC certified candidate names from the 1999 eligibility list and forwarded a certification list to the DPS on November 27, 2001. On November 29, 2001, a PACE review of the certified candidates was completed by Evans and forwarded to Jackson. On November 30, 2001, after Carnevale had explained the concept of limited promotions to the candidates on the certification list, nine police officers on the list were promoted to limited sergeants.

Six of the nine limited sergeants served one year and were automatically promoted to sergeant. The other three limited sergeants were eventually demoted because three sergeants returned from military duty; however, all three demoted sergeants were reinstated at the top of the 2001 list and were promoted to permanent sergeant positions from the 2001 list.

In November 1999, eighty officers had started out on the 1999 eligibility list for promotion to sergeant. By November 2001, forty-nine of those eighty officers had already been promoted or their names had been removed, making number fifty the top-ranking candidate remaining on the 1999 eligibility list. Thus, the nine promoted officers were ranked numbers fifty through fifty-nine

on the 1999 eligibility list.  Of the nine promoted officers, three are African-American officers and six are Caucasian officers.  All nine are males.

Each plaintiff took the civil service exam in the fall of 2001 and was ranked on the 2001 eligibility list.  Plaintiffs were ranked numbers 4, 6, 8, 9, 10, 11, 12, 14, 16, 17, 19, 21, 28, 31, 50, and 55 on the 2001 eligibility list.  Although three plaintiffs were also ranked on the 1999 list, no plaintiff was ranked highly enough on the 1999 list to receive one of the nine promotions awarded in November 2001.

Plaintiffs brought suit in federal district court, asserting that their promotions to the rank of sergeant were either delayed or prevented as a result of unlawful race or gender discrimination.  Defendants moved  for summary judgment, which the district court granted.  The district court held that plaintiffs had not presented direct evidence of discrimination.  Although plaintiffs established a prima facie case of discrimination based on circumstantial evidence, the district court found that defendants offered a legitimate nondiscriminatory reason for using the 1999 list and that plaintiffs failed to show that this legitimate nondiscriminatory reason was pretext for discrimination.

II.

Before turning to the merits of plaintiffs' claims, we must address defendants' argument that plaintiffs lacked standing to bring their discrimination claims.  Three elements are necessary for a plaintiff to establish standing: (1) injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *Ne. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993).  Injury in fact means that the injury is concrete and particularized, and actual or imminent, as opposed to conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Defendants argue that plaintiffs lack standing to bring their claims because they cannot show concrete, particularized injury.  According to defendants, plaintiffs have failed to present evidence that the use of the 1999 list to make limited promotions caused their own promotions to sergeant to be prevented or even significantly delayed.  If the 2001 list had been used to promote officers to sergeant, however, four of the sixteen plaintiffs would have been in the top nine eligible candidates. These four plaintiffs would likely have received limited promotions.  As for the remaining twelve plaintiffs, they would have moved up the 2001 eligibility list, if it had been used, as the sergeant positions were filled from that list.  Given that the last promotion to sergeant off of the 1999 list went to candidate number 59 on that list, and that the lowest ranking plaintiff on the 2001 list was candidate number 55, it is likely that each of these twelve plaintiffs would have been promoted to sergeant during the two years in which the 2001 list was active.  Thus, use of the 1999 list likely caused a delay in promotion to sergeant for each of these twelve plaintiffs.  In sum, as a result of the use of the 1999 list, four plaintiffs were prevented from being promoted to sergeant in November 2001, and twelve others were prevented from moving up the 2001 list and their promotions to sergeant were thereby delayed. We find this alleged injury to be sufficiently concrete and particularized to satisfy constitutional requirements.

Defendants also argue that plaintiffs cannot show that their injuries are fairly traceable to the challenged conduct because plaintiffs were not ranked highly enough on the 1999 eligibility list to receive any of the nine promotions in November 2001.  The challenged conduct alleged to be discriminatory, however, is the timing of the decision to promote officers.  Thus, assuming for the moment that there was a discriminatory decision to "time" the promotions, it is clear that plaintiffs' injuries – not receiving limited promotions in November 1999 or having promotions delayed by virtue of not moving up the 2001 eligibility list – are causally connected to that decision.  The district court correctly held that plaintiffs had standing to bring their claims.  We now turn to the merits of those claims.

III.

This court reviews the grant of summary judgment *de novo*. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Summary judgment will be affirmed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there [wa]s no genuine issue as to any material fact and that the moving party [wa]s entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If "a reasonable jury could return a verdict for the non-moving party," summary judgment for the moving party is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the district court's decision, this court draws all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In order to establish a discrimination claim under Title VII, plaintiffs must produce either direct or circumstantial evidence of discrimination. *DiCarlo*, 358 F.3d at 414. Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Once plaintiffs produce direct evidence of discrimination, the burden shifts to the employer to show that it would have taken the employment action even in the absence of discrimination. *Id.*

A.

Plaintiffs argue that they presented direct evidence of discrimination to the district court. Specifically, they contend that Thatcher's discussion with Jackson, during which he informed Jackson that three African-American candidates would receive promotions if the 1999 list was used and suggested to Jackson that using the 1999 list was an opportunity to diversify the rank of sergeant, constituted direct evidence of discrimination. Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Thatcher's statements to Jackson do not constitute direct evidence of discrimination. Even if we assume that Thatcher compared the eligibility lists and recommended that Jackson use the 1999 list because of the presence of African-American candidates on that list, finding that Jackson based his decision on the racial composition of the 1999 list still requires the inference that Jackson agreed with Thatcher's reasoning and acted on it. Because this inference is required, the fact that Thatcher discussed the three African-American candidates on the 1999 list with Jackson does not constitute direct evidence of discrimination. The district court properly held that plaintiffs did not establish discrimination on account of race by direct evidence.

B.

We now turn to plaintiffs' attempts to prove discrimination by use of circumstantial evidence. Applying the burden shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973), plaintiffs may set forth a prima facie case of discrimination, at which point a presumption arises that the employer unlawfully discriminated against plaintiffs. *DiCarlo*, 358 F.3d at 414. To set forth a prima facie case of discrimination based on a failure to promote, plaintiffs must show: (1) they are members of a protected class; (2) they applied and were qualified for promotion; (3) they were considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). Additionally, in cases of "reverse discrimination" where, as here, plaintiffs are not members of a protected class, this court has held that the plaintiff must demonstrate "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 255 (6th Cir. 2002) (quoting *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985)) (alteration omitted); *see also Sutherland*, 344 F.3d at 614-15;.

Once plaintiffs establish a prima facie case of discrimination, the burden then shifts to the defendants to articulate some legitimate, nondiscriminatory reason for the defendants' action. *DiCarlo*, 358 F.3d at 414. If the defendants carry this burden, plaintiffs must prove that the legitimate reasons offered by defendants were in fact a pretext for discrimination. *Id.* at 414-15. A plaintiff establishes pretext by showing that the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision not to promote, or (3) was insufficient to warrant the decision not to promote. *Zambetti*, 314 F.3d at 258 (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

The district court held that plaintiffs established a prima facie case of discrimination based on a failure to promote. Defendants argue that this decision was erroneous and they urge us to affirm the district court's judgment on the basis that plaintiffs cannot establish a prima facie case of failure to promote. According to defendants, at the time the promotions were made, no plaintiff was ranked highly enough on the active 1999 list to have received one of the nine promotions. Thus, defendants argue that plaintiffs were not "qualified for promotion" at the time the decision was made because they were not ranked highly enough on the 1999 list to be promoted, plaintiffs were not "considered for" promotion because only those candidates on the 1999 list could be considered for promotion, and plaintiffs did not possess "similar qualifications" as the promoted candidates because they were on a different eligibility list. We reject the defendants' argument that plaintiffs have failed to establish a prima facie case because they were not ranked highly enough on the 1999 list. As we have already discussed, the plaintiffs' claim is that the CPD purposefully chose the time for initiating the promotional process in order to gain the advantage of using the 1999 eligibility list rather than the 2001 list so as to benefit certain individuals on account of their race. Therefore, plaintiffs' ranking on the 1999 list is not dispositive of their claim.

We briefly turn to defendants' argument that plaintiffs cannot show, under the fourth prong of the prima facie case, that the promotions went to officers outside of plaintiffs' protected class because six of the nine officers who received promotions were Caucasian. Of course, three of the promoted officers were African-American candidates. Although the lists in this case are not easily categorized as inside or outside the protected class, we think that the proper focus is on the individuals on the list for whose benefit the alleged discriminatory conduct was undertaken – here, the African Americans. If the decision to promote at a certain time was made on the basis of race, such decision was discriminatory notwithstanding the fact that some other Caucasian officers also benefitted from the decision. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 323 (3d Cir. 2000) ("[A]n employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class.").

In sum, plaintiffs met each prong required to establish a prima facie case for failure to promote.[1] The burden therefore shifted to the defendants to articulate some legitimate nondiscriminatory reason for promoting individuals using the 1999 eligibility list. According to the defendants, the 1999 list was used because that was the list that was active at the time that the decision to fill the vacancies was made. By early- or mid-November, Jackson felt that officers should not have to work any longer without a sergeant and therefore decided that the promotions had to be made. At that point, to purposefully delay the request for certification until the 2001 list was effective would have been an improper circumvention of the civil service rules. Moreover, Jackson believed that using the 1999 list was the fairest thing to do and that it would have been unethical for him to delay the promotions until the 2001 list became effective.

---

[1]Because we agree with the district court's holding that plaintiffs failed to present evidence of pretext, we need not determine whether the plaintiffs have satisfied the background circumstances requirement of reverse discrimination – an issue not reached by the district court.

Plaintiffs argue that the defendants' proffered  legitimate nondiscriminatory reason – compliance with the civil service rules – for the use of the 1999 list was a pretext for race and gender discrimination. Plaintiffs have failed, however, to come forward with evidence that would allow a reasonable jury to conclude that the civil service rules were not the legitimate reason behind the use of the 1999 list. Completely lacking from the extensive record before us is any evidence that Jackson, in deciding when to promote candidates, placed any weight on race.

Plaintiffs place inordinate weight on the meeting between Jackson and Thatcher in which the three African-American candidates on the 1999 list were discussed. Although Thatcher told Jackson that the 1999 list had three African-American candidates and use of the 1999 list represented an opportunity to diversify the rank of sergeant, there is no evidence that Jackson compared the two lists or even knew the racial composition of the 2001 list. In fact, Thatcher testified that the 2001 list was not discussed at the meeting. It is therefore difficult to understand how Jackson could have made a race-based comparison between the eligibility lists. Indeed, without some comparison of the lists, Jackson may have believed that using the 2001 list would have been an equal or better opportunity to diversify the rank of sergeant. Although plaintiffs suggest that Jackson knew the racial composition of the 2001 list because the list had been made public and Jackson had called the first ten officers on the 2001 list to congratulate them, drawing such an inference would be unreasonable. Jackson and Thatcher testified that Jackson had no first-hand knowledge of the top-ranking individuals on the 2001 list. There are over 1800 officers in the Columbus police department. Any suggestion that Jackson somehow knew the race of the 2001 candidates by calling them is purely speculative. Most important, however, even if we could infer that Jackson knew the racial composition of the 1999 and 2001 lists, his knowledge of some of the candidates' race is not indicative of discriminatory conduct. Indeed, as we focus on the civil service system's use of eligibility lists, it is easy to lose sight of the fact that most employers know the races of their employees. That Jackson may have known the candidates' races does not alleviate the plaintiffs' burden of providing evidence that he acted on the basis of that knowledge. No evidence exists on which a reasonable jury could conclude that Jackson's conduct was racially motivated.

Gammill's testimony does not change our analysis. Gammill testified at his deposition that he told Thatcher that Jackson should make a decision as to which eligibility list to use before the 2001 list was made public because, that way, no one could later claim that Jackson compared the two lists. Gammill also testified that he told Thatcher that Jackson should use the 2001 list because it consisted of better candidates and that Thatcher responded by telling Gammill that Jackson had decided to use the 2001 list. The district court refused to consider Gammill's testimony concerning what Jackson told Thatcher because it was inadmissible hearsay. The district court characterized Gammill's testimony as hearsay within hearsay, requiring exceptions for both levels of hearsay under Fed. R. Evid. 805. With regard to Jackson's statements, the district court recognized that these statements are party admissions under Fed. R. Evid. 801(d)(2).[2] The district court would not consider Thatcher's statements to Gammill, however, because these statements were hearsay not within any exception. We disagree. In our view, Thatcher's statements also constitute party admissions. Thatcher is an agent of a party under Fed. R. Evid. 801(d)(2)(D). "Rule 801(d)(2)(D) is designed to bind the employer where one of its managerial employees makes a statement within the scope of the employee's duties as a manager." *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 750 (6th Cir. 2005); *see also Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003) ("'[S]cope of employment' criterion extends beyond direct decision-makers."); *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir. 1983) ("[I]t is necessary . . . to show, to support admissibility, that the content of the declarant's statement concerned a matter within the scope of his agency"). In this case,

---

[2]The district court specifically stated that Jackson's statements "may be admissible as a statement against interest under Fed. R. Evid. 801(d)(2)." Although the district court referred to the correct evidentiary rule, it mislabeled Jackson's statements as against interest. In fact, Jackson's statement is a party admission, which is not hearsay and thus not required to fit within an exception.

Thatcher's statements were made within the scope of his agency. Thatcher was the deputy chief – one of only five deputy chiefs reporting directly to Jackson – charged with managing the promotional process for the CPD. When he spoke on the subject of promotions, he was speaking within the scope of his employment.

Our conclusion that Thatcher's statements were not hearsay does not mean that those statements constitute evidence of discrimination. Gammill did not offer any insight into why Jackson allegedly had decided to use the 2001 list, and Gammill readily admitted that he did not know why the 1999 list was ultimately used. Moreover, nothing in Gammill's testimony calls into question Jackson's assertion that he chose not to delay the promotional process because a delay would have been unfair and unethical. In short, Gammill's testimony, although admissible, cannot support an inference of discrimination.

Plaintiffs also argue that they were more qualified than those candidates who received promotion. Although consciously choosing a less-qualified candidate may constitute evidence of pretext, *see Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 577 (6th Cir. 2003) (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)), it is undisputed that all of the employees ranked on an eligibility list are in fact qualified to be promoted. Indeed, it would defeat the purpose of the civil service rules if the CPD could simply elect to forego consideration and promotion of candidates ranked below a certain arbitrary number on an eligibility list. Indeed, plaintiff Powell and Snyder were ranked numbers 55 and 59 on the 2001 list yet, as we have already held, their standing to pursue their claims depends on our acceptance of their argument that their chances of promotion did not expire until November 30, 2003. Finally, although an employer's choice of a less-qualified candidate may constitute evidence of discrimination in some instances, even assuming that the plaintiffs were somehow more qualified than those on the 1999 list, the relative qualifications of the candidates does not impugn Jackson's belief that he effectively lacked a choice in candidates.

Plaintiffs also argue that the timing of the decision is suspicious, given that the request for certification followed the release of the 2001 list. No reasonable inference of discrimination can be drawn from the timing of the decision, however. All of the vacancies existed prior to the release of the 2001 list. Indeed, plaintiffs offer evidence that the promotions were initially delayed. Plaintiffs also do not challenge that Jackson and the CPD were aware that promotions would have to be made in the weeks leading up to November 30, 2001. Although plaintiffs argue that Jackson's timing was suspicious, they fail to explain how Jackson could have legally and ethically delayed the promotions until the 2001 list became active.

Plaintiffs also argue that pretext has been shown by the fact that the November 2001 promotions deviated from the CPD's past practice in a number of respects. Plaintiffs' claim that the CPD's past practice was to delay promotions when an active list was set to expire is without support in the record. Lieutenant Mark Gramlich, who works for the CPD's personnel bureau, testified that promotions are typically made right up until the expiration of an eligibility list. In response to Gramlich's testimony, plaintiffs rely only on the deposition testimony of William Capretta, the FOP lodge president. Referring to the CPD's past practices, Capretta said, "They'll let an old list die on out *if it's a day or two*." (emphasis added) However, plaintiffs have produced no evidence of an occasion when the list was allowed to "die out" and Capretta could not recall a specific instance in which it did. Nor do plaintiffs dispute that Jackson made the decision to promote no later than November 19, 2001. Thus, even assuming the truth of Capretta's statement, the CPD's "past practice" of letting a list "die" with a day or two remaining before it expires is readily distinguishable from the situation here, where nine vacancies arose over the course of a few months and were ultimately filled with more than ten days remaining on the life of the active eligibility list.

Plaintiffs also claim that the November 2001 promotions were "suspicious" because they involved limited rather than regular promotions; they deviated from past practice in that no advance information was provided to the candidates and there was no announcement of the promotions in the daily bulletin; and the promotions occurred in the middle of a pay period, which was atypical. Again, we note that many of these claims of "suspicious" irregularities are simply not supported on the record. For example, plaintiffs claim in their brief that "Capretta believes that [Jackson and Brown] did not notify him of their plans for the promotions because they feared he would try to prevent them from occurring." In actuality, when Capretta was asked if it would be rare for Jackson not to mention the upcoming promotions to him, Capretta said, "Not for Chief Jackson probably because he's not real talkative and stuff on things, and – but, you know, that wasn't the reason I was in there [meeting with Jackson]." Likewise, the only record evidence cited by plaintiffs in support of their claim that promotions do not normally occur in the middle of a pay period is the unsubstantiated statement of one of the individual plaintiffs. Plaintiffs' claim that the use of limited promotions were somehow related to the promotion of minorities is untenable. The only evidence in the record is that the "limited promotion" option was championed by Carnevale at the DPS, not the CPD. Nowhere have plaintiffs alleged that Carnevale or Brown acted based on a racially discriminatory motivation. Even if we were to credit plaintiffs' claims absent proper evidentiary support, such alleged irregularities do not create an inference of discrimination. The use of limited promotions, the rush to complete the process once the decision was made, and the lack of ceremonial pomp are explained by the fact that these vacancies arose suddenly and in large numbers following the terrorist attacks of September 11, 2001. It is also obvious that the vacancies arose at an inopportune time, just before the eligibility lists were set to change. Nonetheless, all of the evidence indicates that the promotions were made in accord with the civil rules and in a fairly typical fashion. We are therefore unable to infer a discriminatory motivation from the process and timing itself.[3]

Finally, the opinions of Gammill, Evans, and Gramlich that the decision to use the 1999 list was, or may have been, based on race does not constitute evidence of pretext. It is well settled that "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of [] discrimination." *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (quoting *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986)) (first alteration in original).

Plaintiffs have failed to present any evidence that Jackson acted on the impermissible basis of race and not the permissible basis of the civil service rules' requirements and his ethical obligations in accordance therewith. The district court's decision to grant summary judgment to defendants on plaintiffs' claims of racial discrimination was therefore correct.

IV.

Plaintiffs presented no evidence, aside from their claims that the use of limited promotions and the actual promotional process departed from past practice, that the decision to use the 1999 list was a pretext for gender discrimination. The district court therefore properly granted summary judgment on the gender discrimination claims.

---

[3]This conclusion is supported by the arbitrator's finding that the promotional appointments did not violate the contract or any binding past practice. The arbitrator explained that although the 1999 list expired before the appointments were made, it was valid on the date that the eligibles were certified. The arbitrator added that to certify as eligible officers who were not on the unexpired list but were on the not-yet-effective list would have resulted in a false certification, prematurely using the new list and effectively shortening the life of the existing list to something less than the required two years.

V.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of defendants.