NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0769n.06

No.  08-2295

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

BRIDGET RAY,

     Plaintiff-Appellant,

     v.

OAKLAND COUNTY CIRCUIT COURT,

     Defendant-Appellee.

_____/

**FILED**
**Dec 07, 2009**
LEONARD GREEN, Clerk

On Appeal from the United
States District Court for the
Eastern District of Michigan
at Detroit

**Before:**    **GUY, CLAY, and WHITE, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**    Plaintiff Bridget[1] Ray is a long-term employee of defendant Oakland County Circuit Court who filed federal and state race discrimination claims against her employer after she was passed over for a new position. Plaintiff challenges the district court's grant of summary judgment for defendant, asserting that she established both her *prima facie* case and pretext on the part of defendant.  Finding that plaintiff presented no evidence that the reasons given by defendant for its promotion decision were actually pretext for discrimination, we affirm.

**I.**

_____

    [1]Although "Bridget" has been used throughout this litigation, the record reveals the correct spelling is "Bridgett."

Plaintiff, who is African-American, was hired by defendant as a part-time clerical trainee in the Oakland County Probate Court in March 1991. She received numerous promotions through the years until 2002, when she was appointed Probate Specialist, which is her current position. During those years, plaintiff completed both associate's and bachelor's degrees, as well as an MBA from Lawrence Technological University.

In late 2006, defendant underwent a reorganization and created and announced a new position called Court Clerk Coordinator. The announcement was made by Kevin Oeffner, Oakland County Circuit Court Administrator, via email directed to all Circuit and Probate Court employees. The position stated "required minimum qualifications" of a two-year Associate's degree; one year of court records processing; successful completion of examination and physical; and completion of the probationary period. The posting also listed "desirable qualifications," including "[c]onsiderable knowledge of procedures related to court proceedings and appropriate documentation;" and "[c]onsiderable knowledge of statutory requirements associated with court processing." Furthermore, the job description portion of the posting gave a "general summary" of the position:

> Under limited supervision, assists in training and overseeing the work of Judicial Court Clerks, the visiting judge clerks, students, and interns. Promotes the orderly flow of court proceedings and related documentation. Assists in supervising the accuracy of journal entries, and other court processes. Ensures the collection of fees by overseeing the performance of related procedures in a timely manner. Participates in the committees related to the implementation of special projects. Assists with training judicial court clerks in all aspects of judicial proceedings. Includes docket management, docket reporting, and processing paperwork. Participates in the recruitment, selection, and training of judicial court clerks. Coordinates clerk coverage for the Family Division and Civil/Criminal Division Judges. Assists with training staff of Clerk Register's Office in criminal procedure practices, assists Court

and Court Administrator's Office in providing reports for State Court Administrative Office (SCAO).

Sixteen applicants, including plaintiff, sought the position in response to the initial email announcement. Plaintiff was the only Probate Court employee to apply. Jennifer Clark, Supervisor Clerk Support, selected five of the 16 applicants for interviews, and plaintiff was not one of the five.[2] Clark and Gwynne Starkey, Circuit Court Chief-Civil/Criminal Division, conducted the interviews. One of the five interviewed was Laura Hutson, a Judicial Court Clerk, who was ultimately selected for the position.

After conducting the interviews, defendant reposted the position as an "Open Competitive Examination," requiring the completion of an Oakland County Merit System employment application. Over 100 applications were submitted after this posting. Plaintiff did not re-submit her application. Jennifer Clark received a "Certification of Eligibles" list from the Human Resources office, which narrowed the contenders to 13.[3] She chose to recommend Laura Hutson, who was on the list, for the position. Her recommendation was accepted by the final decision maker, Oeffner, and Clark did not conduct further interviews.

Plaintiff filed suit in district court in November 2007, following the receipt of her right-to-sue letter from the EEOC, claiming race discrimination under Title VII and the Michigan Elliott-Larsen Civil Rights Act. The district court granted defendant's motion for

---

[2]Plaintiff notes that all five were white females, which is not disputed by defendant. Clark testified at her deposition that she had not worked with plaintiff, who worked for the Probate Court, and was not aware of plaintiff's race. She also testified that she did not choose the two men (one white and one African-American) who applied for the position, because she had worked with each of them and found their work mediocre.

[3]These were the 13 applicants who received a test score of 100 and provided official college transcripts.

summary judgment in August 2008, and denied plaintiff's subsequent motion for reconsideration. This timely appeal followed.

## II.

### A.    Plaintiff's Claims and Standard of Review

Plaintiff claims that defendant's treatment of her in the promotion process constituted illegal discrimination on the basis of race under both Title VII and Michigan's Elliott-Larsen Civil Rights Act.[4] To maintain a Title VII claim where there is no direct evidence of discrimination, the plaintiff's indirect evidence is considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). First, if the plaintiff establishes her *prima facie* case, a presumption of unlawful discrimination arises; the burden of production then shifts to the defendant for the articulation of a legitimate, nondiscriminatory reason for its action. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802), *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719-20 (6th Cir. 2006).

Once the explanation for the adverse action is given, the plaintiff then "must prove that the legitimate reasons offered by defendant[] were in fact a pretext for discrimination." *Id*. at 720 (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)). The ultimate burden of persuading the fact finder remains with the plaintiff. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007).

---

[4]Elliott-Larsen claims are subject to the same analysis as those brought under Title VII. *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, n.4 (6th Cir. 2003).

This case does not involve direct evidence of race discrimination. The district court determined, applying the *McDonnell Douglas* framework to both plaintiff's federal and state claims, that she could not establish a *prima facie* case of race discrimination. It declined to address defendant's argument concerning pretext.

We review the district court's summary judgment decision *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2380 (2009). Summary judgment is appropriately entered where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The facts and any inferences are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 390 (6th Cir. 2009) (citations omitted).

## B.    *Prima Facie* Case

The familiar four-part *McDonnell Douglas* test for a *prima facie* case of discriminatory failure to promote requires the plaintiff to demonstrate that (1) she is a member of a protected class; (2) she applied for and was qualified for the promotion; (3) she was considered for and was denied the promotion; and (4) other similarly qualified employees who are not members of the protected class received promotions at the time she

was denied a promotion. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

Defendant does not contest that plaintiff is a member of a protected class or that she was qualified for the position she sought. Rather, defendant argued on summary judgment that plaintiff did not apply for the position, having failed to submit an application after the reposting, and that the recipient of the position, Laura Hutson, was not similarly situated to plaintiff. The district court agreed.[5]

Concerning the issue of the lack of an application, plaintiff points to her rejection letter, which simply stated she was not chosen because another person was better suited for the position, not because she failed to apply for the position.[6] She asserts that she was not "advised" of the requirement to re-apply, and the fact that only five of the 16 initial applicants re-applied "support[s] the reasonable inference that some persons were told that they had to re-apply to be considered further, but others were not similarly advised." Plaintiff also asserts that because she was not offered an interview when she was one of 16 applicants, it would have been no different had she applied after the reposting.[7] We note that Hutson

---

[5]The district court based its ruling on defendant's "similarly situated" argument, and did not address the issue of the need for a second application. The district court also noted, in conclusion, that there was no evidence that any decision maker was aware of plaintiff's race, and thus there could be no inference of discrimination.

[6]This does not appear in the list of exhibits to defendant's motion for summary judgment, and plaintiff did not submit exhibits with her response brief. Plaintiff did not submit exhibits until after the district court had already ruled on the motion for summary judgment and plaintiff's motion for reconsideration. Those untimely exhibits were struck from the record by the district court.

[7]Plaintiff also makes a confusing argument that the defendant had never employed an African-American person in the position of "Court Clerk Coordinator," to which defendant responds that it had not employed *anyone* in the position, as it was newly created. It is unclear to which position plaintiff is referring, and the 45-person list plaintiff includes in her brief is not a part of the record below because plaintiff's

was hired after the second posting, to which she responded, but this was in part on the basis of an interview Hutson had as a result of her initial application. We agree with plaintiff that the lack of a second application should not be fatal to her claim.[8]

Turning to the "similarly situated" prong of the *McDonnell Douglas* framework for a failure to promote claim, defendant argues that Hutson's seven years of experience as a Judicial Court Clerk, by itself, sufficiently differentiates the two candidates.[9] Defendant examines the requirements of the position as articulated by Clark in deposition, such as

> not just looking at the cases that are on the judge's docket making sure that they have next event dates and things like that, but actually digging deeper into the docket, looking to see if procedure and policies are being followed as far as, let's say, for example, a criminal docket, are jailers being processed faster than bailers, how does the judge schedule their dockets, do they have pretrials, do they go right from arraignment to pretrial to trial, you know, things like that.

There is no evidence in the record that plaintiff had any such experience, and, as defendant notes, plaintiff would have had no criminal docket experience as an employee of the Probate Court.

Plaintiff argues that Hutson was not even qualified for the position, having no "degree at all." However, Hutson was only a few credits short of a bachelor's degree at the time of her application. Defendant asserts that a practice known as "underfilling," where a person

exhibits were struck from the record.

[8]Although we do not dispose of the case on this basis, we note that Clark could only select a candidate from among those applications which were submitted pursuant to the second advertisement of the opening.

[9]Defendant devotes significant briefing to pointing out errors in plaintiff's brief, such as plaintiff's statement that there are no facts in the record showing Hutson's duties as a Judicial Court Clerk, where Hutson's resume was an exhibit to the motion for summary judgment.

lacking educational requirements could be hired but not paid at the level of the position until

the requirements were completed, could have allowed for the hiring of such an individual,

which is not disputed by plaintiff.[10]  Plaintiff does not contend that  allowing Hutson to fill

the position with a degree pending completion was an exception to defendant's normal

practice.

Alternatively, plaintiff cites to her deposition transcript in arguing that she was

similarly situated to Hutson, asserting she also had the experience that was required for the

position.  Specifically, plaintiff argues she had the required "docket management experience"

by pointing to the following sections of her deposition:

Q [by counsel for defendant]:  – you're not using docket to refer to any of the
materials in the files that you went over, is that correct?

A:  That's not correct, no.

Q:  Okay.  Explain it to me, then.

A:  We – even as Probate Register and as a Probate – Deputy Probate Register,
a Probate Specialist, we're the ones who initially start the case.  We assign
court dates.

Q:  Uh-huh.

A:  As well as, we have the responsibility to set cases on the docket, to take
cases off a docket.  That – all of that is in docket management.

Q:  Okay.

A:  We're the ones – we have the – we have the authority to adjourn cases.
We were assigned at some point to adjourn – we have – only Deputy Probate

_____

[10]Plaintiff also points to a white candidate who applied after the initial posting, Jean Harroun, an employee in the Case Management Office, who plaintiff argues did not have the educational experience required for the job, yet was interviewed for the position.

Registers II have the authority to adjourn the case, and my – this – my coworkers who are under me were not able to do that. They had to come to myself or another coworker in the same classification in order to get it authorized.

Q: What were the circumstances under which you were free to adjourn a case?

A: We could adjourn a case – at one point we had a list of reasons that were allowed to be adjourned, and we could base that on those set of reasons. There's also another situation on there at the Court's discretion that we could use as well as a reason, depending on what someone said to us, basically--

Q: Okay.

A: –and we felt it warranted an adjournment.

. . . .

Q [by counsel for plaintiff]: Can you think of anything else that would be involved in docket management other than scheduling cases and adjourning them and removing them from the docket?

A: We actually put all of that on the computer. We were the ones that input–we create the docket.

Q: So that is docket management, right?

A: Yes.

Plaintiff also points to another of her duties as a Probate Specialist to argue she was "similarly situated" to Hutson:

Q [by counsel for defendant]: Were you ever assigned to work one-on-one with a judicial clerk to show them what to do?

A: We were assigned as Probate Specialists that if we had a judicial clerk, we were told that if they needed anything, if they were new, that it was our job to assist them and train them in anything that they needed.

Q: So basically, then, if a judicial court clerk had a question about something and they were in your physical probate area, they could come and ask you.

A: They were supposed to ask us.

Q: And who else – who else would they ask besides you?

A: It was four of us. We're Probate Specialists, and that was part of our job.

In making its ruling on summary judgment, the district court noted that "[i]n Plaintiff's various capacities in the Probate Court, Plaintiff was neither assigned to a judge nor did she have direct experience managing a judge's docket." It also noted that Clark had identified prior judicial court clerk experience as among the top criteria for candidates, and contrasted the seven years of direct judicial clerking experience possessed by Laura Hutson with plaintiff's Probate Court experience. The district court found that although plaintiff had been employed in the court system longer and had more education than Hutson, there was no issue of material fact as to the similarly situated prong of the *McDonnell Douglas* test, as there were significant differences in the "relevant aspects of [their] employment situation[s]." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis omitted) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). The court reasoned that although plaintiff may have been qualified for the position, this did not make her "similarly situated" to all of the other qualified applicants, and disposed of the case without addressing the issue of pretext.

**B.      Pretext**

Even if we were to conclude that the district court erred in finding that plaintiff failed to make out a *prima facie* case, we are convinced she can not satisfy the requirement of

establishing pretext.[11]  A plaintiff shows the proffered reason for the adverse action was pretextual by demonstrating that the defendant's reason "(1) has no basis in fact; (2) did not actually motivate the decision not to promote, or (3) was insufficient to warrant the decision not to promote." *Grizzell*, 461 F.3d at 720 (citing *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 255 (6th Cir. 2002)) (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Defendant cites to deposition testimony of Clark and Starkey to show that they were looking for Circuit Court courtroom and docketing experience in choosing someone for the position, and that they both knew Laura Hutson's work and thought she would be well suited for the position.  Specifically, Ms. Starkey  testified that

> [Hutson] had a great deal of experience in running the dockets for her judge. I knew her from prior working with her that she was organized.  She was very efficient.  She had worked with us on a couple of other projects that we tried to institute.
>
> When we tried to institute some new procedures with court clerks, she had assisted us in developing some procedures and also training other clerks on the various procedures that we wanted to do. . . .

Plaintiff, however, asserts that defendant's rationale for the selection has shifted during this litigation, bringing into question the credibility of defendant's current explanation.  Plaintiff pieces together portions of the answer to her complaint in suggesting that initially defendant explained that the position was reposted solely to allow judicial court clerks to apply for the position:

---

[11]We may affirm for any reason supported by the record. *See Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 514 (6th Cir. 2003).

'[T]he most important selection criterion for the [Court Clerk Coordinator] position was docket management experience . . . [and] the position was reposted as an open Competitive Examination' to allow Court Clerks to compete for the position.

Plaintiff contrasts this explanation with the explanation in defendant's brief in support of its motion for summary judgment, where defendant stated that

Mr. Oeffner informed Ms. Clark that the Court Clerk Coordinator position must be reposted as an open Competitive Examination in order to give those Probate Court and Circuit Court employees, who were not in the Merit System, the opportunity to be considered for the position.

Plaintiff contends defendant's explanation was changed only after Ms. Harroun, in discovery, "testified that Judicial Court Clerks did NOT acquire docket management experience in that position."[12] Plaintiff argues that such a "shifting justification" is sufficient evidence of

---

[12]Defendant cites to Harroun's testimony, which indicates that individual judges' clerks had only started within the previous six months to have primary responsibility for inputting dates in their judges' dockets. However, the testimony also shows that judges' individual clerks had always interacted with the Case Management Office in planning cases:

Q: Just briefly, with respect to the docket management, the Case Management Office does and did, vis-a-vis, what the judicial court clerks do and did.
    Well, first, let me ask you this: Have you ever had occasion to work as a substitute judicial court clerk?
A: Yes.
Q: So you have some knowledge of what judicial court clerks do as well.
A: Quite a bit.
Q: Do they have contact with the judge's docket, court docket?
A: Now they do.
Q: And didn't they used to before?
A: To a point, right. We managed it and told them what needed to be set, what needed to be done.
Q: Okay. So they were familiar with it--
A: Right. Correct.
Q: – is that fair to say?
A: Yes, very fair.
Q: Would they work with your office in terms of making sure that the judge's docket ran smoothly--
A: Yes.
Q: – and was in proper order?

pretext, citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996).[13]

This argument lacks merit. First, a thorough reading of the answer to the First Amended Complaint reveals that the explanation at the time the defendant's answer was filed is the same explanation given at the time of the summary judgment motion, i.e., that the position was reposted to allow individuals who were not a part of the Merit System to apply. Second, we cannot find that Ms. Harroun's testimony demonstrated that applicants who were Judicial Court Clerks had not been exposed to docket management. Although it appears that the job duties of court clerks had recently changed to involve *additional* docket management, it is beyond dispute that court clerks' jobs had always involved management of courtroom activities and case schedules.

In the end, plaintiff has simply not presented evidence of significance to show that the legitimate, nondiscriminatory reasons stated for the placement of Laura Hutson were actually pretext for race discrimination. *See Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999). Plaintiff asserts—citing to *Farber v. Massillon Board of Education*, 917 F.2d

---

A: Yep. They always called to see what the numbers were and if we had any that needed to be set that we hadn't contacted them about.
Q: So it's fair to say that the Case Management Office traditionally, even before the change in the last six months, always worked with judicial court clerks to make sure the judges' dockets were in order and ran smoothly; is that correct?
A: Always.

[13]In *Cicero*, an age discrimination case, the explanation for terminating the plaintiff's position changed from poor performance, to a decision to fire the entire management team (which in fact, was not done), to a decision to fire those managers who played a certain role. *Cicero*, 280 F.3d at 592. In *Thurman*, the defendant asserted plaintiff's work performance problems only after the litigation began, despite plaintiff's direct questions about why he was terminated at or around the time of his termination.

1391 (6th Cir. 1990)—that other applicants who were interviewed (i.e., Harroun and Hutson) did not have the "requisite qualifications," and that defendant relied on "subjective criteria" in determining who had the relevant docket management experience. However, unlike *Farber*, where the selected candidate for Director of Instruction had no teaching experience, and the "subjective criteria" were found to be a disguise for discriminatory action, the criteria in this case were used to select among various qualified applicants. Plaintiff's unsupported assertions do not allow her to survive defendant's motion. *See Matsushita*, 475 U.S. at 587.

Regardless of whether the case was properly disposed of on the "similarly situated" issue, which resulted in the district court's determination that plaintiff failed to establish a *prima facie* case, we find no genuine issue of material fact with respect to the question of pretext.

The district court is **AFFIRMED**.

**CLAY, Circuit Judge, dissenting.** Bridget Ray was a qualified African-American applicant who applied for a promotion to the position of Court Clerk Coordinator at the Oakland County Circuit Court. Construing the facts in the light most favorable to her, Ray was passed over for the position for someone who did not facially meet the job's qualifications, and the curious circumstances of the application process and shifting rationales for the position criteria most valued by Defendant indicate that Defendant's non-discriminatory reason for not promoting Ray may have been pretextual. For these reasons, I respectfully dissent.

The majority's opinion lays out the relevant facts as stated by the parties but fails to present them in a light most favorable to Plaintiff, as required on summary judgment. The majority seems to accept as true everything that Defendant's various witnesses say and glosses over the irregularities of the hiring process. The position of clerk court coordinator was posted as a merit system job. Plaintiff, a long-time Probate Court employee, applied for the job along with sixteen other people. Jennifer Clark, supervisor of clerk support, decided to interview five applicants, all of whom were white and had inferior educational credentials to Plaintiff. Two of the women, including Laura Hutson who was eventually hired, did not facially meet the educational requirements of the job posting. Following the interviews, Defendant decided to hire Hutson but determined that she was ineligible for the position because she was not a merit system employee. To further its objective of selecting Hutson, Defendant reposted the position as "open competitive examination." More than 150 people applied. Defendant asserts that it reposted the position in an effort to make all circuit and probate employees eligible, but when human

resources forwarded the names of the thirteen applicants purportedly most qualified, a list that included Hutson, Defendant decided not to interview any new applicants and merely hired Hutson.

As the majority notes, this case deals with indirect evidence of racial discrimination and should be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). While the district court held that Ray did not present a *prima facie* case, the majority does not reach that issue and instead rests its holding on its determination that Ray did not demonstrate pretext. Ray undoubtedly made out a *prima facie* case for racial discrimination – which the district court failed to recognize because of the improper weight it accorded to Defendant's evidence. Furthermore, I disagree with the majority's pretext analysis and find that the irregularities of the application process and Defendant's shifting emphasis on the importance of docket management experience raises issues that should be decided by a jury.

## A.      Defendant Established a *Prima Facie* Case

To establish a *prima facie* case for failure to promote, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion, (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for the promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000). Both parties agree that Ray is part of a protected class and that she was considered for and denied the promotion. While Defendant disputes whether Ray actually applied, I agree with the majority's determination that Ray's actions in applying for the job were sufficient.

The district court found against Ray on the similarly situated prong by reading the similarly situated criteria way too broadly and by uncritically accepting Defendant's own rationale for its actions. "The burden of establishing a prima facie case of disparate treatment is not onerous."

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The requirement of making out a *prima facie* case is not "meant to stymie plaintiffs, but simply serves to 'bring the litigants and the court expeditiously and fairly to the ultimate question.'"  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Burdine*, 450 U.S. at 253).  "An exact correlation with the comparable employee is not required."  *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005).

The district court's decision made two erroneous determinations on the issue of whether the two individuals being compared were "similarly situated."  First, it determined that the different jobs held by Hutson and Ray at the time they applied meant that they were not similarly situated.  Second, it impermissibly relied on the non-discriminatory reasons proffered by Defendant that should be considered at the pretext stage of the analysis.

The first mistake is based on too broad an extension of *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994).  That case held that:  "In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the . . .employees who he alleges were treated more favorably."  *Id*. at 802.  While Hutson and Ray had different jobs, the differences between their positions do not necessarily mean that hiring one over the other automatically indicates the absence of discrimination.  The employees in *Pierce* were different in a much more material way.  *Pierce* involved a male employee's reverse sex discrimination claim based on a demotion he received for violating the company's sexual

harassment policy, while a female employee who also violated the policy was not disciplined. The crucial difference between the two, however, was that Pierce was a supervisor, and his actions could have made the company itself liable. The differences between a circuit court and a probate court employee are not so material.

Under the district court's overly broad reading of *Pierce*, Ray could never have set forth a claim for racial discrimination. She was the only probate employee who applied for the position. By the district court's reasoning, no candidate hired by Defendant could be similarly situated to Ray. Therefore, absent direct evidence of racial discrimination, Defendant's decision not to promote Ray would be entirely shielded from scrutiny under Title VII no matter what the actual motivation of those in charge of hiring.

Even read more narrowly, the district court's analysis remains equally flawed. The district court found that Ray's superior educational record and additional experience in a variety of court-related jobs "cannot create a substantial issue of material fact as to this prong because those qualifications are not equivalent to Court Clerk experience." The district court determined that nothing in Ray's resume could match court clerk experience. The district court's analysis means Defendant could have appointed a poor performing, highly unqualified court clerk and still prevailed at the summary judgment stage because Ray did not have "equivalent" court clerk experience. For instance, the district court's opinion would have been identical had Defendant promoted Markian Karpinsky, a male court clerk who applied for the position. According to Defendant, Karpinsky was not interviewed because Clark "considered his job performance to be mediocre, he made errors, and made

inappropriate use of county property." (Def. Br. at 14.) Despite this dismal evaluation, the district court's holding would apply with equal force had it hired Karpinsky instead of Hutson. It is incredible to imagine that a plaintiff could not make out a Title VII case when she was qualified for the position, and a defendant promoted instead a clearly unqualified employee.

Defendant also relies on the more applicable *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232 (6th Cir. 2005). In that case, a female employee did not receive a promotion. A male employee was promoted instead, and the court found that some comparison between the two employees was necessary at the *prima facie* stage of the case.

> Engaging in such a comparison does not impermissibly conflate the two stages of the *McDonnell Douglas* test, for just as the court must independently review the plaintiff's qualifications in determining whether the plaintiff has met the second prong of her *prima facie* burden, so too does the court conduct an independent review of the relative qualifications of the plaintiff and the person selected for the position based on the evidence presented in order to determine whether the plaintiff has satisfied the fourth prong of her *prima facie* burden.

*Id*. at 243. In that case, the court analyzed the two applicant's experience and found that the plaintiff was not as qualified as the person promoted for the position.

The problem with Defendant's argument on this point is that Ray is only less qualified than Hutson if you accept Defendant's testimony about what it valued in a Court Clerk Coordinator. The need to rely on Defendant's purported preferences for the position make this case readily distinguishable from *White*. The district judge noted that "Clark identified prior Court Clerk experience as being one of her top criteria for a successful candidate." The relative weight assigned by Clark to a candidate's qualifications and attributes are irrelevant

in determining whether Ray made out a *prima facie* case. "[A] court misapplies the structure of *McDonnell Douglas* by holding that [plaintiff] fails at the prima facie stage due to defendant's nondiscriminatory reason." *Cline*, 206 F.3d at 661. Clark's stated preferences for what she most valued in an applicant should be considered in the second and third steps of the *McDonnell Douglas* framework.

Defendant makes no argument for Hutson's supposedly superior qualifications without specifically referencing the stated preferences of Clark or other decision-makers. On the terms of the job posting itself, the only deficiency of either employee was actually Hutson's lack of a formal degree. Absent countervailing evidence from Defendant, Ray was actually passed over for a position for which she had the qualifications in favor of someone who facially did not meet those qualifications. It would pervert the *McDonnell Douglas* framework to find that such a situation cannot constitute discrimination merely because the two applicants worked in different court departments. Even accepting Hutson as qualified, it is unclear who would be the better employee, the one with superior education and long-term court experience or the one with slightly more direct experience. Similarly situated supervisors could reasonably prefer either applicant. Clark later claimed that she preferred what she thought to be the more relevant experience, but to consider Clark's testimony runs afoul of the admonition in *Cline* that a court should not consider the non-discriminatory

reason offered by a defendant at the *prima facie* stage. For these reasons, it is apparent that Ray easily presents a *prima facie* case.[1]

## B. Defendant's Non-Discriminatory Reason May Have Been Pretextual

Ray concedes that Defendant has offered a nondiscriminatory reason for hiring Hutson. The burden then shifts to Plaintiff to "produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (quoting *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994)). "Pretext may be established 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (quoting *Burdine*, 450 U.S. at 256.) "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* at 393. In addition, "shifting justifications over time calls the credibility of those justifications into question." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

Viewed in the light most favorable to Plaintiff, the oddities of the application process and Defendant's assertions about the importance of "docket management experience" would

---

[1] While the majority does not reach the issue of *prima facie* case, it is troubling that the district court's flawed analysis is uncritically presented by the majority without comment. If the majority wanted to base its decision solely on pretext, it would have been better served to omit its recitation of the parties' positions and the district court's unsound analysis.

allow a reasonable jury to find that Defendant's nondiscriminatory reasons were pretextual.[2]

As stated above, the application process did not proceed in an orderly or credible manner. At first, the position was listed as a merit position. Hutson was not a merit system employee. Nonetheless, she not only applied for the job but was interviewed and chosen as the top applicant. Having chosen Hutson, Defendant apparently realized that the job needed to be posted as "open competitive examination" in order for Hutson to be eligible. When the position was reposted, more than 150 applicants applied. Thirteen were forwarded to Clark as the most qualified applicants, but rather than interview any of them, she simply recommended Hutson. This series of events is irregular, to say the least. One is left to wonder why Hutson applied in the first place if she was not eligible for the position. After the job was reposted, 154 applicants applied, and it appears that at least thirty-three were current Oakland County employees. These people apparently realized they were ineligible for the first application. (R-14, Defendant's Motion for Summary Judgment, Exhibit 6).

Furthermore, only six of the 15 original applicants reapplied, indicated the majority of those applicants may have become discouraged by the arbitrariness and irregularity of the application process. The record is not clear which of the original applicants were merit system employees and which were not. In any case, when the first posting proved ineffective, Defendant effectively undertook a sham proceeding that induced over 150 applicants, when it probably had already determined that Hutson would receive the job. This

---

[2]Plaintiff also argues that the lack of education of both Hutson and another applicant who was interviewed is evidence of racial discrimination. Defendant has attempted to explain two policies, counting hours towards a bachelor's degree as equivalent to an associate's and "underfilling," in order to justify these deviations.

whole process may have been a contrivance to give the job to Hutson, not in and of itself a violation of Title VII unless motivated by invidious discrimination, but the irregularity suggests improper subjectivity, and "subjective reasons provide 'ready mechanisms for discrimination.'" *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 461 (6th Cir. 2004) (quoting *Grano v. Dep't of Dev. of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983)). Whether the subjectivity was based on race is an issue of fact best left to the fact-finder.

Equally problematic is Defendant's amorphous reliance on "docket-management" experience. In its answer to Ray's complaint, Defendant stated that: "the most important selection criteria for the [Court Clerk Coordinator] position was docket management experience, which Plaintiff did not have." (Answer ¶ 7.) This answer is extremely problematic and lacking in credibility where Defendant was so set on hiring Hutson that it underwent a sham second application process. Hutson, one would think, would therefore have exemplary docket management experience. Another applicant, Jean Harroun, testified that at the time of Hutson's promotion, the Circuit Court Record Specialists, and not the court clerks, were responsible for maintaining the judges' dockets.

The majority attempts to dismiss this testimony by stating that: "Although it appears that the job duties of court clerks had recently changed to involve *additional* docket management, it is beyond dispute that court clerks' jobs had always involved management of courtroom activities and case schedules." Majority Op. at 13. Contrary to the majority's unwarranted conclusion, Harroun testified that court clerks were familiar with the docket but

that the case management employees "managed [the docket] and told [court clerks] what needed to be set, what needed to be done." This level of "docket management experience" is very similar to Plaintiff's. Ray testified that in her position she could schedule and adjourn cases and that she put the information into the computer to create the docket. Despite this similarity to Hutson's experience, Clark allegedly rejected Ray in part because Clark did not " see any courtroom experience or docket management experience, and that's really what I was focusing on." A reasonable jury could find that Ray's docket management experience was at least similar to Hutson's. Considering this was Defendant's "most important selection criteria," it is troubling in the extreme that the rejected African-American employee's docket management experience was not that dissimilar from that of the white employee who was hired.

At best, it appears that Clark wished to hire Hutson, a white woman, as Court Clerk Coordinator. The resulting job search involved several irregularities, and Defendant's desire to hire Hutson has made it necessary for Defendant to struggle to clearly articulate its supposedly objective criteria. The obvious focus on Hutson may or may not involve racial discrimination, but the oddities surrounding the hiring, the inability to rely on objective criteria, and the failure to even grant an interview to a qualified African-American employee could allow a jury to find that the decision was racially motivated. For these reasons, I respectfully dissent.