' RALPH B. GUY, JR., Circuit Judge.
Plaintiff Bridget[1] Ray is a long-term employee of defendant Oakland County Circuit Court who filed federal and state race discrimination claims against her employer after she was passed over for a new position. Plaintiff challenges the district court’s grant of summary judgment for defendant, asserting that she established both her prima facie case and pretext on the part of defendant. Finding that plaintiff presented no evidence that the reasons given by defendant for its promotion decision were actually pretext for discrimination, we affirm.
I.
Plaintiff, who is African-American, was hired by defendant as a part-time clerical trainee in the Oakland County Probate Court in March 1991. She received numerous promotions through the years until 2002, when she was appointed Probate Specialist, which is her current position. During those years, plaintiff completed *875 both associate’s and bachelor’s degrees, as well as an MBA from Lawrence Technological University.
In late 2006, defendant underwent a reorganization and created and announced a new position called Court Clerk Coordinator. The announcement was made by Kevin Oeffner, Oakland County Circuit Court Administrator, via email directed to all Circuit and Probate Court employees. The position stated “required minimum qualifications” of a two-year Associate’s degree; one year of court records processing; successful completion of examination and physical; and completion of the probationary period. The posting also listed “desirable qualifications,” including “[c]onsiderable knowledge of procedures related to court proceedings and appropriate documentation;” and “[considerable knowledge of statutory requirements associated with court processing.” Furthermore, the job description portion of the posting gave a “general summary” of the position:
Under limited supervision, assists in training and overseeing the work of Judicial Court Clerks, the visiting judge clerks, students, and interns. Promotes the orderly flow of court proceedings and related documentation. Assists in supervising the accuracy of journal entries, and other court processes. Ensures the collection of fees by overseeing the performance of related procedures in a timely manner. Participates in the committees related to the implementation of special projects. Assists with training judicial court clerks in all aspects of judicial proceedings. Includes docket management, docket reporting, and processing paperwork. Participates in the recruitment, selection, and training of judicial court clerks. Coordinates clerk coverage for the Family Division and Civil/Criminal Division Judges. Assists with training staff of Clerk Register’s Office in criminal procedure practices, assists Court and Court Administrator’s Office in providing reports for State Court Administrative Office (SCAO).
Sixteen applicants, including plaintiff, sought the position in response to the initial email announcement. Plaintiff was the only Probate Court employee to apply. Jennifer Clark, Supervisor Clerk Support, selected five of the 16 applicants for interviews, and plaintiff was not one of the five.[2] Clark and Gwynne Starkey, Circuit Court Chief-Civil/Criminal Division, conducted the interviews. One of the five interviewed was Laura Hutson, a Judicial Court Clerk, who was ultimately selected for the position.
After conducting the interviews, defendant reposted the position as an “Open Competitive Examination,” requiring the completion of an Oakland County Merit System employment application. Over 100 applications were submitted after this posting. Plaintiff did not re-submit her application. Jennifer Clark received a “Certification of Eligibles” list from the Human Resources office, which narrowed the contenders to 13.[3] She chose to recommend Laura Hutson, who was on the list, for the position. Her recommendation was accepted by the final decision maker, Oeffner, and Clark did not conduct further interviews.
*876 Plaintiff filed suit in district court in November 2007, following the receipt of her right-to-sue letter from the EEOC, claiming race discrimination under Title VII and the Michigan Elliott-Larsen Civil Rights Act. The district court granted defendant’s motion for summary judgment in August 2008, and denied plaintiffs subsequent motion for reconsideration. This timely appeal followed.
II.
A. Plaintiffs Claims and Standard of Review
Plaintiff claims that defendant’s treatment of her in the promotion process constituted illegal discrimination on the basis of race under both Title VII and Michigan’s Elliott-Larsen Civil Rights Act.[4] To maintain a Title VII claim where there is no direct evidence of discrimination, the plaintiffs indirect evidence is considered under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 98 S.Ct. 1817, 86 L.Ed.2d 668 (1973). Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir.2009). First, if the plaintiff establishes her prima facie case, a presumption of unlawful discrimination arises; the burden of production then shifts to the defendant for the articulation of a legitimate, nondiscriminatory reason for its action. Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817), Grizzell v. City of Columbus Div. of Police, 461 F.3d 711, 719-20 (6th Cir.2006).
Once the explanation for the adverse action is given, the plaintiff then “must prove that the legitimate reasons offered by defendant ] were in fact a pretext for discrimination.” Id. at 720 (citing DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir.2004)). The ultimate burden of persuading the fact finder remains with the plaintiff. See Blair v. Henry Filters, Inc., 505 F.3d 517, 524 (6th Cir.2007).
This case does not involve direct evidence of race discrimination. The district court determined, applying the McDonnell Douglas framework to both plaintiffs federal and state claims, that she could not establish a prima facie case of race discrimination. It declined to address defendant’s argument concerning pretext.
We review the district court’s summary judgment decision de novo. White v. Baxter Healthcare Corp., 533 F.3d 381, 389 (6th Cir.2008), cert. denied, — U.S. -, 129 S.Ct. 2380, 173 L.Ed.2d 1293 (2009). Summary judgment is appropriately entered where “the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). The facts and any inferences ai’e viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). “The non-moving party may not rest upon its mere allegations or denials of the adverse party’s pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.” Risch v. Royal Oak Police Dept., 581 F.3d 383, 390 (6th Cir.2009) (citations omitted).
B. Prima Facie Case
The familiar four-part McDonnell Douglas test for a prima facie case of discriminatory failure to promote requires the plaintiff to demonstrate that (1) she is a *877 member of a protected class; (2) she applied for and was qualified for the promotion; (3) she was considered for and was denied the promotion; and (4) other similarly qualified employees who are not members of the protected class received promotions at the time she was denied a promotion. Sutherland v. Mich. Dep’t of Treasury, 344 F.3d 603, 614 (6th Cir.2003) (citing Dews v. A.B. Dick Co., 231 F.3d 1016, 1020-21 (6th Cir.2000)).
Defendant does not contest that plaintiff is a member of a protected class or that she was qualified for the position she sought. Rather, defendant argued on summary judgment that plaintiff did not apply for the position, having failed to submit an application after th« > reposting, and that the recipient of the position, Laura Hutson, was not similarly situated to plaintiff. The district court agreed.[5]
Concerning the issue of the lack of an application, plaintiff points to her rejection letter, which simply stated she was not chosen because another person was better suited for the position, not because she failed to apply for the position.[6] She asserts that she was not “advised” of the requirement to re-apply, and the fact that only five of the 16 initial applicants reapplied “support[s] the reasonable inference that some persons were told that they had to re-apply to be considered further, but others were not similarly advised.” Plaintiff also asserts that because she was not offered an interview when she was one of 16 applicants, it would have been no different had she applied after the reposting.[7] We note that Hutson was hired after the second posting, to which.she responded, but this was in part on the basis of an interview Hutson had as a result of her initial application. We agree with plaintiff that the lack of a second application should not be fatal to her claim.[8]
Turning to the “similarly situated” prong of the McDonnell Douglas framework for a failure to promote claim, defendant argues that Hutson’s seven years of experience as a Judicial Court Clerk, by itself, sufficiently differentiates the two candidates.[9] Defendant examines the requirements of the position as articulated by Clark in deposition, such as
not just looking at the cases that are on the judge’s docket maldng sure that *878 they have next event dates and things like that, but actually digging deeper into the docket, looking to see if procedure and policies are being followed as far as, let’s say, for example, a criminal docket, are jailers being processed faster than bailers, how does the judge schedule their dockets, do they have pretrials, do they go right from arraignment to pretrial to trial, you know, things like that.
There is no evidence in the record that plaintiff had any such experience, and, as defendant notes, plaintiff would have had no criminal docket experience as an employee of the Probate Court.
Plaintiff argues that Hutson was not even qualified for the position, having no “degree at all.” However, Hutson was only a few credits short of a bachelor’s degree at the time of her application. Defendant asserts that a practice known as “underfilling,” where a person lacking educational requirements could be hired but not paid at the level of the position until the requirements were completed, could have allowed for the hiring of such an individual, which is not disputed by plaintiff.[10] Plaintiff does not contend that allowing Hutson to fill the position with a degree pending completion was an exception to defendant’s normal practice.
Alternatively, plaintiff cites to her deposition transcript in arguing that she was similarly situated to Hutson, asserting she also had the experience that was required for the position. Specifically, plaintiff argues she had the required “docket management experience” by pointing to the following sections of her deposition:
Q [by counsel for defendant]:—you’re not using docket to refer to any of the materials in the files that you went over, is that correct?
A: That’s not correct, no.
Q: Okay. Explain it to me, then.
A: We—even as Probate Register and as a Probate—Deputy Probate Register, a Probate Specialist, we’re the ones who initially start the case. We assign court dates.
Q: Uh-huh.
A: As well as, we have the responsibility to set cases on the docket, to take cases off a docket. That—all of that is in docket management.
Q: Okay.
A: We’re the ones—we have the—we have the authority to adjourn cases. We were assigned at some point to adjourn—we have—only Deputy Probate Registers II have the authority to adjourn the case, and my—this—my coworkers who are under me were not able to do that. They had to come to myself or another coworker in the same classification in order to get it authorized.
Q: What were the circumstances under which you were free to adjourn a case? A: We could adjourn a case—at one point we had a list of reasons that were allowed to be adjourned, and we could base that on those set of reasons. There’s also another situation on there at the Court’s discretion that we could use as well as a reason, depending on what someone said to us, basically—
Q: Okay.
A: —and we felt it warranted an adjournment.
Q [by counsel for plaintiff]: Can you think of anything else that would be involved in docket management other than scheduling eases and adjourning *879 them and removing them from the docket?
A: We actually put all of that on the computer. We were the ones that input—we create the docket.
Q: So that is docket management, right?
A: Yes.
Plaintiff also points to another of her duties as a Probate Specialist to argue she was “similarly situated” to Hutson:
Q [by counsel for defendant]: Were you ever assigned to work one-on-one with a judicial clerk to show them what to do?
A: We were assigned as Probate Specialists that if we had a judicial clerk, we were told that if they needed anything, if they were new, that it was our job to assist them and train them in anything that they needed.
Q: So basically, then, if a judicial court clerk had a question about something and they were in your physical probate area, they could come and ask you.
A: They were supposed to ask us.
Q: And who else—who else would they ask besides you?
A: It was four of us. We’re Probate Specialists, and that was part of our job.
In making its ruling on summary judgment, the district court noted that “[i]n Plaintiffs various capacities in the Probate Court, Plaintiff was neither assigned to a judge nor did she have direct experience managing a judge’s docket.” It also noted that Clark had identified prior judicial court clerk experience as among the top criteria for candidates, and contrasted the seven years of direct judicial clerking experience possessed by Laura Hutson with plaintiffs Probate Court experience. The district court found that although plaintiff had been employed in the court system longer and had more education than Hut-son, there was no issue of material fact as to the similarly situated prong of the McDonnell Douglas test, as there were significant differences in the “relevant aspects of [their] employment situation[s].” Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir.1998) (emphasis omitted) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir.1994)). The court reasoned that although plaintiff may have been qualified for the position, this did not make her “similarly situated” to all of the other qualified applicants, and disposed of the case without addressing the issue of pretext.
C. Pretext
Even if we were to conclude that the district court erred in finding that plaintiff failed to make out a prima facie case, we are convinced she can not satisfy the requirement of establishing pretext.[11] A plaintiff shows the proffered reason for the adverse action was pretextual by demonstrating that the defendant’s reason “(1) has no basis in fact; (2) did not actually motivate the decision not to promote, or (3) was insufficient to warrant the decision not to promote.” Grizzell, 461 F.3d at 720 (citing Zambetti v. Cuyahoga Cmty. College, 314 F.3d 249, 255 (6th Cir.2002)) (citing Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir.1994)).
Defendant cites to deposition testimony of Clark and Starkey to show that they were looking for Circuit Court courtroom and docketing experience in choosing someone for the position, and that they both knew Laura Hutson’s work and thought she would be well suited for the *880 position. Specifically, Ms. Starkey testified that
[Hutson] had a great deal of experience in running the dockets for her judge. I knew her from prior working with her that she was organized. She was very efficient. She had worked with us on a couple of other projects that we tried to institute.
When we tried to institute some new procedures with court clerks, she had assisted us in developing some procedures and also training other clerks on the various procedures that we wanted to do....
Plaintiff, however, asserts that defendant’s rationale for the selection has shifted during this litigation, bringing into question the credibility of defendant’s current explanation. Plaintiff pieces together portions of the answer to her complaint in suggesting that initially defendant explained that the position was reposted solely to allow judicial court clerks to apply for the position:
‘[T]he most important selection criterion for the [Court Clerk Coordinator] position was docket management experience ... [and] the position was reposted as an open Competitive Examination’ to allow Court Clerks to compete for the position.
Plaintiff contrasts this explanation with the explanation in defendant’s brief in support of its motion for summary judgment, where defendant stated that
Mr. Oeffner informed Ms. Clark that the Court Clerk Coordinator position must be reposted as an open Competitive Examination in order to give those Probate Court and Circuit Court employees, who were not in the Merit System, the opportunity to be considered for the position.
Plaintiff contends defendant’s explanation was changed only after Ms. Harroun, in discovery, “testified that Judicial Court Clerks did NOT acquire docket management experience in that position.”[12] Plaintiff argues that such a “shifting justification” is sufficient evidence of pretext, *881 citing Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir.2002); Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir.1996).[13]
This argument lacks merit. First, a thorough reading of the answer to the First Amended Complaint reveals that the explanation at the time the defendant’s answer was filed is the same explanation given at the time of the summary judgment motion, i.e., that the position was reposted to allow individuals who were not a part of the Merit System to apply. Second, we cannot find that Ms. Harroun’s testimony demonstrated that applicants who were Judicial Court Clerks had not been exposed to docket management. Although it appears that the job duties of court clerks had recently changed to involve additional docket management, it is beyond dispute that court clerks’ jobs had always involved management of courtroom activities and case schedules.
In the end, plaintiff has simply not presented evidence of significance to show that the legitimate, nondiscriminatory reasons stated for the placement of Laura Hutson were actually pretext for race discrimination. See Warfield v. Lebanon Corr. Inst., 181 F.3d 723, 730 (6th Cir.1999). Plaintiff asserts—citing to Farber v. Massillon Board of Education, 917 F.2d 1391 (6th Cir.1990)—that other applicants who were interviewed (i.e., Harroun and Hutson) did not have the “requisite qualifications,” and that defendant relied on “subjective criteria” in determining who had the relevant docket management experience. However, unlike Farber, where the selected candidate for Director of Instruction had no teaching experience, and the “subjective criteria” were found to be a disguise for discriminatory action, the criteria in this case were used to select among various qualified applicants. Plaintiffs unsupported assertions do not allow her to survive defendant’s motion. See Matsushita, 475 U.S. at 587, 106 S.Ct. 1348.
Regardless of whether the case was properly disposed of on the “similarly situated” issue, which resulted in the district court’s determination that plaintiff failed to establish a prima fade case, we find no genuine issue of material fact with respect to the question of pretext.
The district court is AFFIRMED.

. Although "Bridget” has been used throughout this litigation, the record reveals the correct spelling is "Bridgett."

. Plaintiff notes that all five were white females, which is not disputed by defendant. Clark testified at her deposition that she had not worked with plaintiff, who worked for the Probate Court, and was not aware of plaintiff’s race. She also testified that she did not choose the two men (one white and one African-American) who applied for the position, because she had worked with each of them and found their work mediocre.

. These were the 13 applicants who received a test score of 100 and provided official college transcripts.

. Elliott-Larsen claims are subject to the same analysis as those brought under Title VII. Sutherland v. Mich. Dept. of Treasury, 344 F.3d 603, n. 4 (6th Cir.2003).

. The district court based its ruling on defendant's ''similarly situated” argument, and did not address the issue of the need for a second application. The district court also noted, in conclusion, that there was no evidence that any decision maker was aware of plaintiff's race, and thus there could be no inference of discrimination.

. This does not appear in the list of exhibits to defendant's motion for summary judgment, and plaintiff did not submit exhibits with her response brief. Plaintiff did not submit exhibits until after tire district court had already ruled on the motion for summary judgment and plaintiff’s motion for reconsideration. Those untimely exhibits were struck from the record by the district court.

. Plaintiff also makes a confusing argument that the defendant had never employed an African-American person in the position of "Court Clerk Coordinator," to which defendant responds that it had not employed anyone in the position, as it was newly created. It is unclear to which position plaintiff is referring, and the 45-person list plaintiff includes in her brief is not a part of the record below because plaintiff's exhibits were struck from the record.

. Although we do not dispose of the case on this basis, we note that Clark could only select a candidate from among those applications which were submitted pursuant to the second advertisement of the opening.

. Defendant devotes significant briefing to pointing out errors in plaintiff's brief, such as plaintiff's statement that there are no facts in the record showing Hutson's duties as a Judicial Court Clerk, where Hutson’s resume was an exhibit to the motion for summary judgment.

. Plaintiff also points to a white candidate who applied after the initial posting, Jean Harroun, an employee in the Case Management Office, who plaintiff argues did not have the educational experience required for the job, yet was interviewed for the position.

. We may affirm for any reason supported by the record. See Loftis v. United Parcel Serv., Inc., 342 F.3d 509, 514 (6th Cir.2003).

. Defendant cites to Harroun's testimony, which indicates that individual judges' clerks had only started within the previous six months to have primary responsibility for inputting dates in their judges' dockets. However, the testimony also shows that judges' individual clerks had always interacted with the Case Management Office in planning cases:
Q: Just briefly, with respect to the docket management, the Case Management Office does and did, vis-a-vis, what the judicial court clerks do and did.
Well, first, let me ask you this: Have you ever had occasion to work as a substitute judicial court clerk?
A: Yes.
Q: So you have some knowledge of what judicial court clerks do as well.
A: Quite a bit.
Q: Do they have contact with the judge's docket, court docket?
A: Now they do.
Q: And didn’t they used to before?
A: To a point, right. We managed it and told them what needed to be set, what needed to be done.
Q: Okay. So they were familiar with it—
A: Right. Correct.
Q: —is that fair to say?
A: Yes, very fair.
Q: Would they work with your office in terms of making sure that the judge's docket ran smoothly—
A: Yes.
Q: —and was in proper order?
A: Yep. They always called to see what the numbers were and if we had any that needed to be set that we hadn’t contacted them about.
Q: So it’s fair to say that the Case Management Office traditionally, even before the change in the last six months, always worked with judicial court clerks to make sure the judges' dockets were in order and ran smoothly; is that correct?
A: Always.

. In Cicero, an age discrimination case, the explanation for terminating the plaintiff's position changed from poor performance, to a decision to fire the entire management team (which in fact, was not done), to a decision to fire those managers who played a certain role. Cicero, 280 F.3d at 592. In Thurman, the defendant asserted plaintiff's work performance problems only after the litigation began, despite plaintiff's direct questions about why he was terminated at or around the time of his termination.