**Steven J. SPECK, Plaintiff,**

v.

**AGREX, INC., Defendant.**

**Case No. 3:11 CV 462.**

United States District Court,
N.D. Ohio,
Western Division.

Aug. 30, 2012.

Francis J. Landry, Wasserman, Bryan, Landry & Honold, Toledo, OH, Stephen P. Sonnenberg, Paul Hastings, New York, NY, for Plaintiff.

Bridget B. Romero, Rebecca A. McGinnis, Lathrop & Gage, Kansas City, MO, Stephen P. Sonnenberg, Paul Hastings, New York, NY, Tybo A. Wilhelms, Bugbee & Conkle, Toledo, OH, for Defendant.

## MEMORANDUM OPINION AND ORDER

JACK ZOUHARY, District Judge.

### INTRODUCTION

This case centers on a hill of beans—a costly hill. Plaintiff Steven Speck was terminated from his job as Chief Operating Officer ("COO") and President of Farmer Grain Dealers, Inc. ("FGDI") after FGDI ended up on the wrong side of soybean contracts worth $150 million. Plaintiff alleges his termination violated Title VII and the Age Discrimination Employment Act ("ADEA"), as well as state discrimination law, public policy, and his compensation plan (Doc. 1 at 6–10). Defendant Agrex, Inc. ("Agrex"), who owns FGDI, denies the allegations and moves for summary judgment (Doc. 61). The matter has been fully briefed (Docs. 71 & 73).

### BACKGROUND

FGDI is a grain commodities trader serving both domestic and international markets. Plaintiff became president and Chief Executive Officer ("CEO") of FGDI in 2000 and was responsible for its management, with some oversight by the Board of Directors (Docs. 54 at 8; 66 at ¶ 6). FGDI also employed Robert Obrock, COO, and Jean Bratton, Chief Financial Officer ("CFO"), both of whom reported directly to Plaintiff (Doc. 54 at 7). As of May 2007, FGDI's management was organized as follows:

### Agrex Purchases FGDI

In June 2007, FGDI was purchased by Agrex, a full-service foods commodity trading company and a wholly-owned subsidiary of Mitsubishi Corporation (Doc. 66 at ¶ 2). Following this purchase, Hiroshi Fukuchi, a Japanese citizen, was appointed as CEO and Chairman of FGDI. Plaintiff's title was changed from CEO to COO, although he remained President. The former COO, Obrock, was made Executive Vice President. Plaintiff received the same compensation and performed the same duties as when he was CEO (Doc. 54

at 8). The only real difference—Plaintiff now reported to Fukuchi instead of the Board (Doc. 54 at 8). Additionally, a Managing Committee was formed in order to give Agrex, the new majority owner, a more definitive role in FGDI's operation. Both Fukuchi and Plaintiff were on the Managing Committee as well as several executives from Agrex and FGDI (Doc. 66–3 at 2).

FGDI's new management was organized as follows:

In March 2008, Fukuchi sent a report to Agrex (Doc. 58 at 5) expressing concerns about Plaintiff's management capability, his knowledge of the grain business, and the potential for extremely large losses at FGDI (Doc. 64 at ¶ 4). Specifically, Fukuchi believed Plaintiff spent too much time on trades and not enough time managing, lacked strategic planning and analysis, failed to understand the goals of Agrex and its shareholders, and lacked basic knowledge of the grain futures market (Doc. 64–2 at 10–11). Fukuchi determined Plaintiff needed "significant growth and transformation;" contemplating Plaintiff's eventual termination (Doc. 64–2 at 10), and

requested the assignment of a "Japanese trader" who would be more familiar with Mitsubishi's "way of thinking and point of view" (Doc. 64–2 at 12).

The following month, April 2008, Fukuchi gave Plaintiff a performance evaluation highlighting several of the deficiencies noted in his earlier report. The evaluation highlighted Plaintiff's unsatisfactory performance in futures positions, reporting requirements, and debt management (Doc. 64–3 at 3–4). Later that month, Fukuchi reiterated his desire to have a Japanese employee dispatched to FGDI, stating in an e-mail to Yutaka Kyoya, Agrex's General Manager for Grain (Doc. 64–4 at 9):

> I am proposing that we should do away with the daily local business model that is dependent on one person, and requesting that you consider dispatching a trader who is a Japanese employee, so that we can move the company smoothly and swiftly in the appropriate direction.

Kyoya responded, copying Shinsuke Tokue, Agrex's CEO, and noting concerns over Plaintiff's termination and reorganizing Plaintiff's role in FGDI (Doc. 64–4 at 10–11). Fukuchi replied "we want to be prepared to terminate him in case he does not perform the required work" (Doc. 64–4 at 12). Kyoya denied Fukuchi's request and instead told Fukuchi "to have [Plaintiff] remain for another half year to a year or so and to deal with this one step at a time" (Doc. 65–1 at 5). Despite Fukuchi's lack of confidence, Plaintiff remained in charge of managing FGDI's trading in China (Doc. 54 at 30).

### The Chinese Positions

In early October 2008, Plaintiff sent Fukuchi and the Managing Committee an update of FGDI's performance, claiming FGDI continued to set "record earnings" with a positive assessment of FGDI's market position, including China (Doc. 62–3 at

2). However, at some point during October, Plaintiff became aware of a multi-million dollar dispute between FGDI and a Chinese soybean buyer, Putian Hwakong Oil Mills Co., Ltd. ("Putian") (Doc. 54 at 32), who apparently was threatening to walk away from some of the soybean contracts it had with FGDI unless FGDI was willing to offer deep discounts. By late October, William Gallo, FGDI's Putian broker, was in full-panic-mode (Doc. 62–4):

> [S]o far things do not look good.... Putian i[n] my opinion is looking to shake down FGDI for money.... I think Putian has sustain[ed] a loss with inventory he still has in his facilities and did not sell in the amount of 40 million dollars. COFCO [the import agent] has delayed payment on his loan ... for an additional two months. I do not see how he is going to execute the November cargo as no import agent will take him knowing the situation with COFCO. .... Mr. Peng [an official with Putian] has not showed up yet as a follow up to the meeting yesterday and it would not surprise[ ] me that he is so depressed and on pills as well as drinking. This is not a good situation and I am trying to keep my wits about me and act as professional as possible. There are two law firms here representing his interest who are not at all impressive. I have no idea where he got these guys. COFCO is the most reasonable and is trying to convince Putian to get this setteld [sic] amicably. Steve, we have a situation where [ ] Mr. Peng in my view is so over his head in debt that he is looking for any way to get money out of FGDI. I cannot see us settling [the contract] with out [sic] handing over a tremendous amount of money for reasons which make absolutely no sense. Additionally, he is using this stop loss issue as a way to hold us hostage on the November contract which I believe he can't per-

form unless we agree to some riduculous [sic] settlement on [the contract].

Plaintiff failed to inform Fukuchi or the Managing Committee about Gallo's gloom-and-doom report. Instead, in an e-mail dated mid-November 2008, Plaintiff reported "a good month booking strong monthly earnings.... We are exposed to some of the same risk as others.... In all we are still having a good year and will continue our effort to navigate through the difficult waters" (Doc. 62–5 at 2). However, by November 21, 2008, Plaintiff had recommended FGDI sell their Putian contracts (Doc. 65–5 at 2).

Fukuchi heard about the Putian dispute from Gallo in late October, when Gallo handed him a copy of the panicked e-mail exchange with Plaintiff. Fukuchi then learned there were five contracts in dispute with Putian, totaling $150 million (Doc. 58 at 9). He immediately reported the dispute to Mitsubishi who, given the amount of money at stake, took control of the Putian contracts (Doc. 58 at 10).

**Mitsubishi's Investigation into the Putian Contracts**

In November 2008, Fukuchi, along with personnel from Agrex and Mitsubishi, began investigating the Putian contracts (Doc. 65 at ¶¶ 4–5). The investigation included a review of Putian records and interviews in New York and China. Agrex assigned Akihiro Asami, an export manager with Agrex, to the investigation because of his "experience in the grain trading industry and familiarity with [Mitsubishi's] grain trading operations, practices and procedures" (Doc. 65 at ¶ 5).

Meanwhile, Plaintiff recommended that FGDI close out one of its contracts with Putian to minimize its potential loss—$3 million instead of $8 million (Doc. 64–5 at 2). Plaintiff made this recommendation just one week after he reported FGDI's strong earnings and nearly one month af-

ter he became aware of Putian's dire situation. But by this time, Mitsubishi had taken total control of the matter from Fukuchi (Doc. 58 at 10). The Putian situation continued to worsen for FGDI. In December 2008, Putian sued FGDI, claiming millions of dollars in damages (Docs. 64 at ¶ 9 & 66–6 at 6). That lawsuit was the first of many (Doc. 58 at 11).

The results of Mitsubishi's investigation were reported to Kyoya and other managers at Mitsubishi in early 2009 (Doc. 65 at ¶ 5). The investigation concluded that FGDI's claim representative failed to document the Putian trades and that Plaintiff failed to properly supervise the China operations (Doc. 65 at ¶ 6). Moreover, the investigation found FGDI had not complied with the Putian contract terms, which contributed to the large losses (Doc. 58 at 10).

By February 2009, Mitsubishi authorized FGDI to closeout the Putian contracts, resulting in a loss of over $10 million. The cost of the investigation and the pending civil actions added millions more to FGDI's losses (Doc. 64 at ¶ 12).

**Plaintiff is Fired from FGDI**

On April 1, 2009, Fukuchi asked Kyoya for authorization to recommend Plaintiff's termination to FGDI's Managing Committee (Doc. 64–7). Fukuchi's detailed request explained that because Plaintiff was so heavily involved in soybean contracts, he was "not sufficiently involved in operations as a management executive" (Doc. 64–7 at 5), and that other management would be able to absorb Plaintiff's work "since it was not very much" (Doc. 64–7 at 5). Fukuchi also reiterated his desire to have a Japanese employee sent to augment FGDI's operations (Doc. 64–7 at 5).

Fukuchi recommended that FGDI offer Plaintiff a separation agreement of $100,000 to $200,000 in exchange for his voluntary resignation and waiver of certain rights to sue (Doc. 64–7 at 5). Fukuchi did not believe Plaintiff would sue for nonpayment of his March 2009 bonus given his responsibility for the Putian losses, nor did Fukuchi anticipate any managers following Plaintiff after termination (Doc. 64–7 at 6). Kyoya, mainly concerned with Plaintiff's bonus, preferred to defer a decision on termination until Tokue, Agrex's CEO, weighed in (Doc. 68–2 at 7). Tokue promptly responded via e-mail that same day (Doc. 68–2 at 6):

> [Plaintiff] lacks the qualifications of a management executive ... which has been pointed out already by CEO Fukuchi, and with which I also agree. The [Putian contracts] had been run under the so-called direct supervision of [Plaintiff], and with the exposure and occurrence of serious problems therein, he cannot avoid assuming responsibility. Therefore, we believe that employment termination ... is inevitable.
>
> Since he has nothing to lose and is of the mind to get what he can get, I do not think that we can view the risk of a potential lawsuit lightly. I do not think we would lose in such a case, but it will become a nuisance.
>
> As [Mitsubishi] reinforces its governance, are there any employees who may follow him and leave the company? As indicated by CEO Fukuchi, a group exodus is hard to imagine, but can we be sure that there won't be any managers or traders that will leave? On this point, CEO Fukuchi seems to have already taken this into account, and judges that the effect will be minor, but it is a risk nonetheless. (In this sense as well, is there a need for a mid-level Japanese dispatch employee?)

On April 27, 2009, the Managing Committee (Paul Anderson, CEO of minority shareholder FCStone, LLC; Tomoo Shimizu, Executive Vice President of Agrex; Tokue, Agrex's CEO; and Fukuchi) voted unanimously to terminate Plaintiff's em-

ployment (Doc. 66 at 4). Plaintiff was terminated the next day (Doc. 64 at 5) and the following e-mail was sent to FGDI employees (Doc. 76–2 at 2):

> Everyone,
> Our President and COO, Mr. Steven Speck, voluntarily resigned from the company April 28.
> We appreciate his past contributions to the company, and wish him the best in his future endeavors.
> At this moment, there is no plan to hire somebody for his replacement. We will cover his responsibilities by our existing staff.

Following Plaintiff's termination, his duties were in fact divided among four existing FGDI employees: Fukuchi (CEO), Bratton (CFO), Obrock (EVP), and Dale Krukemeyer, FGDI's export merchant (Doc. 54 at 36). Except for Fukuchi, all were Caucasian Americans (Doc. 54 at 36). Fukuchi and Obrock are older than Plaintiff—who was 50–years old when he was fired—and Bratton and Krukemeyer are only four years younger than Plaintiff (Docs. 54 at 4 & 36; 57 at 4; 59 at 4; 64 at ¶ 2; 67 at ¶ 6). To date, no one has been hired as COO or President at FGDI.

Plaintiff began contemplating a law suit against FGDI almost immediately. On June 1, he sent the following e-mail to Fukuchi (Doc. 64–8 at 2–3):

> Since your arrival at FGDI your discriminatory behavior toward the American management, specifically me, has created a hostile work environment and undue stress. Your decision to terminate my employment might not be of significance to you but be assured it is

very important to me. The far reaching consequences flow beyond me to my wife, children and their financial security. My eighteen year history of building FGDI will be quite compelling, if this matter should result in litigation, as compared to your roughly eighteen months at FGDI and subsequent wrongful termination of my employment.

Plaintiff also blamed Fukuchi for the Putian contracts, stating that had Fukuchi listened to Plaintiff and others at FGDI, some of the company's losses could have been mitigated (Doc. 64–8 at 2).

Only a few months after leaving FGDI, Plaintiff became vice president for Lansing Trade Group ("Lansing"), an agricultural trading company, where he directs international trades (Doc. 54 at 38). His base salary of $175,000 plus incentives was similar to his FGDI compensation (Doc. 55 at 9 & 64 at 12). Plaintiff estimated his 2012 salary at $275,000 (Doc. 54 at 38–39).

In the aftermath of Plaintiff's termination, Obrock, in recognition of his increased responsibilities, was given an $80,000 raise (Doc. 67 at ¶ 5); Krukemeyer voluntarily left FGDI in June, following Speck to Lansing (Doc. 59 at 9); and in September 2009, Fukuchi hired a "Japanese trader" as he had requested over a year earlier. That trader, Asami, was one of the investigators of the Putian contracts, and he was now assigned to serve as Fukuchi's assistant and export merchant (Doc. 63 at ¶¶ 4–5). In that dual role, Asami reports to both Fukuchi and Obrock. Asami's salary was set at $70,000 plus other benefits (Doc. 63 at ¶ 6). After Asami's hiring, FGDI's management was reorganized as follows:

### Plaintiff Files Suit

In early 2010, Plaintiff filed charges with the EEOC alleging national origin and age discrimination (Doc. 62–15), based on Plaintiff's demotion from CEO to COO and his replacement by "a Japanese national in his mid-thirties" (Doc. 62–15 at 3–4). Plaintiff further alleged that FGDI became increasingly hostile toward Americans who were routinely blamed for management mistakes, ultimately causing several employees to leave FGDI (Doc. 62–15 at 4). Plaintiff's final allegation was that FGDI failed to provide him with an industry standard severance package.

Plaintiff's EEOC discrimination claim was limited to age and national origin (Doc. 62–17). The EEOC determined that Plaintiff's evidence of discrimination failed to meet a "more likely than not" standard based on the following findings (Doc. 62–18):

1. In April 2008, [Fukuchi] provided you an email outlining performance deficiencies and verbally addressed the same.

2. [FGDI] states it does not have a standard severance or separation package and is not obligated to offer such. However, [Fukuchi] offered you a severance and separation package in exchange for full release.

3. Your job responsibilities were assumed by your supervisor who is older than you. An individual was hired six months later to handle export trade's [sic] who is not similarly situated.

4. You provided that an American over 50 years of age was also offered a severance and he accepted.

5. [FGDI] has provided a legitimate, nondiscriminatory reason for your termination.

The EEOC closed its file (Doc. 62–19), and Plaintiff timely filed this seven-part Complaint (Doc. 1).

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Cel-*

*otex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). This Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, this Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## ANALYSIS

The Complaint alleges federal and state law claims for: age discrimination (Counts I and II); discrimination based on race or national origin (Counts III and IV); wrongful discharge in violation of public policy (Count V); breach of contract (Count VI); and quasi-contract and unjust enrichment (Count VII). Agrex argues that Plaintiff's discrimination claims (Counts I–IV) fail as a matter of law because Plaintiff has no direct evidence of discrimination and cannot meet any prong of the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Doc. 61 at 20–29).

Agrex also argues Counts III and IV fail for two additional reasons. First, Agrex argues the Treaty of Friendship, Commerce and Navigation (the "FCN Treaty") between the United States and Japan bar claims premised on national origin (Doc. 61 at 29–34). Second, Agrex claims Plaintiff failed to administratively exhaust his race discrimination claims which he never brought before the EEOC as Title VII requires (Doc. 61 at 31–32).

Agrex makes short work of Plaintiff's remaining claims, arguing Plaintiff's public policy claim (Count V) is barred because he has adequate statutory remedies and Plaintiff's claims for breach of contract, quasi-contract, and unjust enrichment (Counts VI–VII) fail because Plaintiff's termination complied with the clear terms of FGDI's compensation plan (Doc. 61 at 32–34).

Plaintiff now concedes that Count V is barred under Ohio law (Doc. 71 at 32), and that claim is dismissed. Plaintiff also concedes that the remaining claims involving his compensation plan depend upon whether he was unlawfully terminated (Doc. 71 at 32–33), and those claims therefore rise or fall with his discrimination claims in Counts I–IV. Additionally, because "Ohio courts utilize the same *McDonnell Douglas* analysis [ ] when analyzing discrimination claims brought under [state law]" this Court considers Plaintiff's federal and state claims simultaneously. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 668 (6th Cir.2000).

### Plaintiff's Race Claims are Barred

Plaintiff's race claims are dismissed because he failed to exhaust them with the EEOC. Generally, the "complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir.2002). However, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998). Plaintiff failed to check the box for race discrimination on his EEOC Complaint. Accordingly, this Court must next determine if Plaintiff "alleged sufficient facts in his EEOC Complaint to put the EEOC on notice of his [race] claim" even though he failed to check the appropriate

box. *See Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir.2004).

■ Plaintiff's EEOC Complaint need not specifically cite to Title VII or "conform to legal technicalities" but it must at a minimum generally describe the discriminatory acts related to the claims. *Jones v. Sumser Retirement Vill.*, 209 F.3d 851, 853 (6th Cir.2000) (quotation omitted). A review of Plaintiff's correspondence with the EEOC Complaint reveals that Plaintiff alleged (Doc. 62–15 at 5) (emphasis added):

> My employment with FGDI, LLC was terminated by the Japanese management of FGDI, LLC *because I am an American citizen and because of my age*, being fifty years old at the time of my termination. I file this complaint so my wrongful termination can be fully investigated, and I stand ready to provide the EEOC with any information it may require to complete its investigation.

"American," of course, is not a race and, based on Plaintiff's EEOC charge, there is no indication what Plaintiff's race even is. The first time there is any record of Plaintiff's race—"Caucasian"—is the Complaint filed in this Court (Doc. 1 at 3). The scope of the EEOC's investigation was limited to evidence concerning "national origin and age," an investigation that resulted in the dismissal of Plaintiff's charges (Doc. 62–18 at 2). Indeed, Plaintiff admits he could not recall discussing race with anyone at the EEOC (Doc. 54 at 25). Moreover, Plaintiff does not contest in his current briefing his failure to exhaust his race discrimination claim. Accordingly, Plaintiff has failed to exhaust his race discrimination claims and those claims are dismissed.

### Direct Evidence of Discrimination

Although Plaintiff relies on the *McDonnell Douglas* burden-shifting framework to prove discrimination, some of his arguments assert evidence of direct discrimination. Discrimination may be proved by introducing direct or circumstantial evidence. *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004). However, the *McDonnell Douglas* burden-shifting framework only applies when discrimination is proven through circumstantial evidence. *Id.* at 415; *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir. 1991).

To show direct evidence of discrimination under Title VII, Plaintiff must offer evidence "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). In other words, "that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003).

Plaintiff did not raise a direct-evidence argument in either his Complaint or Opposition to Summary Judgment and that argument is now waived. *See Idemudia v. J.P. Morgan Chase*, 434 Fed.Appx. 495, 499–500 (6th Cir.2011) (failing to argue a direct discrimination is a waiver of that theory); *see also United States v. Stewart*, 628 F.3d 246, 256 (6th Cir.2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quotation omitted).

■ Even if this Court were to consider a direct-evidence argument, Plaintiff must establish not only that Agrex "was predisposed to discriminate on the basis of age [and national origin], but also that [it] acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th

Cir.2000). Plaintiff fails to meet this standard. Indeed, Plaintiff admits that he has no facts, other than the termination itself, to support discrimination due to his age or national origin (Doc. 54 at 22–23).

Plaintiff's best evidence of discrimination is Fukuchi's repeated requests for a "Japanese trader," but the meaning of this request is disputed. Plaintiff claims the request proves Fukuchi's preference for Japanese over Americans. Agrex disagrees, claiming that when Fukuchi made his requests, he used the term "hojin" to describe the type of employee he wanted at FGDI. While "hojin" can refer to a Japanese national, in this instance Agrex claims that Fukuchi meant it as a reference to a Mitsubishi employee irrespective of citizenship (Doc. 58 at 8). For summary judgment, this Court must presume Fukuchi actually meant he wanted a Japanese citizen at FGDI.

Nonetheless, this request is not direct evidence that Fukuchi was predisposed to discriminate or that his alleged predisposition prompted adverse action. First, the statement is not derogatory towards Plaintiff, as Fukuchi never referenced Plaintiff's age or national origin. Second, Fukuchi's requests were always in the context of Plaintiff's unsatisfactory performance, again, completely independent of his age or national origin. Third, Plaintiff was fired after a long and well-documented investigation into his failings with regards to the Putian contracts. Fourth, the requested "Japanese trader" was not dispatched to FGDI until five months after Plaintiff was fired.

Plaintiff's evidence neither proves Fukuchi was predisposed, nor links that alleged predisposition to his termination. More so, Plaintiff's ADEA claim fails because he offers no evidence that "but-for" his age he was terminated. *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir.2009).

## Circumstantial Evidence of Discrimination

Under the *McDonnell Douglas* burden-shifting framework—which applies equally to Title VII and ADEA claims—Plaintiff bears the initial burden of establishing a prima facie case of discrimination, at which point a presumption arises that Agrex unlawfully discriminated against Plaintiff. *See Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir.2006); *see also McDonnell Douglas Corp.*, 411 U.S. at 802–04, 93 S.Ct. 1817. The burden then shifts to Agrex to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Grizzell*, 461 F.3d at 719–20; *DiCarlo*, 358 F.3d at 414. If Agrex succeeds in this task, the burden shifts back to Plaintiff to demonstrate Agrex's proffered reason was not its true reason, but merely pretext for unlawful discrimination. *Grizzell*, 461 F.3d at 720; *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir.1994) ("[O]nce the employer has come forward with a nondiscriminatory reason for [its actions], the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.") (overruled on other grounds).

### *Plaintiff fails to prove pretext*

### *Plaintiff's prima facie case*

To establish a prima facie case of discrimination, Plaintiff must show he: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or treated differently than a similarly situated, non-protected employee. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir.2006). Agrex disputes the last two factors—whether Plaintiff was qualified and replaced.

### Plaintiff was qualified

For Plaintiff to show he was qualified for his position, he must prove "he was performing his job at a level which met his employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.1990) (quotations omitted). According to Agrex, Plaintiff was not qualified to be COO and President mainly because of the fouled Putian contracts. That might mean Plaintiff was bad at his job, but it does not make him unqualified.

"For purposes of the prima facie case analysis, a plaintiff's qualifications are to be assessed in terms of whether he or she was meeting the employer's expectations prior to and independent of the events that led to the adverse action." *Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 573 (6th Cir.2006). This means Agrex's alleged nondiscriminatory reason for terminating Plaintiff—*i.e.*, the Putian contracts—is irrelevant to whether he was qualified. Indeed, evaluating Plaintiff's prima facie case based on the Putian contracts "would bypass the burden-shifting analysis and deprive [Plaintiff] of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir.2003). The proper standard requires an evaluation of Plaintiff's education, experience, and "demonstrated possession of the required general skills" to determine whether he possesses "the minimum objective criteria required for employment in the relevant field." *Id.* at 575–76.

■ The record supports that Plaintiff possesses such "objective criteria." He graduated college with a bachelor's degree in economics and held positions in the grain industry as a general manager, grain trader, and vice president of grain export trading (Doc. 54 at 5–6). In total, he has almost thirty years of experience in the grain trading industry.

### Plaintiff was not replaced

■ Agrex alleges Plaintiff was not replaced and therefore on this point alone his discrimination claims fail. This Court agrees. As COO and President, Plaintiff was responsible for the general oversight of FGDI, including final authority to make trades overseas. Obrock, the Executive Vice President, and Bratton, the CFO, reported directly to Plaintiff, while he reported solely to Fukuchi. It is undisputed that immediately following Plaintiff's termination his duties were redistributed among Fukuchi, Obrock, Bratton, and Krukemeyer, one of FGDI's export managers. It is also undisputed that a new COO and President was never hired. The law is clear: "[a] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir.2003). Nevertheless, the parties dispute whether Asami, a 37–year old Japanese citizen, "replaced" Plaintiff. He did not.

"[A] plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the [other] employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994) (quotations omitted). Clearly, Asami's employment was not "nearly identical" to Plaintiff. For starters, Asami—Assistant and Export Merchant—was not the COO and President of FGDI, in title or duties, and no one in

management reported to Asami. Simply because both employees traded grain is not enough, ignoring a fundamental distinction: Asami's trades were reported to and approved by Obrock; Plaintiff's trades were reported to and approved by no one.

Other evidence supports that Asami did not replace Plaintiff. First, Asami's salary was over $100,000 less than Plaintiff's. *See Smith v. County of Hamilton,* 34 Fed. Appx. 450, 456 (6th Cir.2002) (holding a lower salary is evidence that positions are not identical even when employees perform some of the same tasks). Second, Asami was hired five months after Plaintiff was terminated. *See Lilley v. BTM Corp.,* 958 F.2d 746, 752 (6th Cir.1992) (hiring after nine-month gap and increase in business was not a replacement); *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 941 (6th Cir.1987) (three-month interval "substantially weaken[s]" the inference); *McDaniel v. Wal–Mart Stores, Inc.,* 94 F.Supp.2d 878, 882 (N.D.Ohio 2000) (six-month interval insufficient). In fact, if Asami replaced anyone at FGDI it was Krukemeyer, not Plaintiff. Krukemeyer voluntarily left FGDI just two months before Asami was hired and both held the same title: Export Merchant. Because Asami did not replace Plaintiff, Plaintiff fails to establish a prima facie case.

### *Agrex gave a legitimate nondiscriminatory reason to terminate Plaintiff*

Even if Plaintiff satisfied his prima facie case, his discrimination claims would still fail. Agrex produced ample evidence supporting a legitimate, nondiscriminatory reason for Plaintiff's termination-namely, unsatisfactory job performance and the Putian contracts. *See Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1116 (6th Cir.2001) (holding performance evaluations which concluded plaintiff "needs improvement" was sufficient evidence of unsatisfactory job performance); *Pottenger v. Potlatch Corp.,* 329 F.3d 740,

746 (9th Cir.2003) (holding multimillion dollar loses over three years was legitimate nondiscriminatory reason). Moreover, the ultimate decision to terminate Plaintiff rested with the Managing Committee, of which Fukuchi was only one of four votes. The burden therefore shifts back to Plaintiff to prove this nondiscriminatory reason is mere pretext.

Pretext may be established "either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 392–93 (6th Cir.2008) (internal quotations omitted). Evidence of pretext can be shown in three ways: (1) the reason had no factual basis, (2) it was not the actual reason, or (3) the reason is insufficient to explain the action taken. *Id.* Plaintiff does not specifically articulate how his evidence demonstrates pretext under any of the three types of rebuttals and, for that reason, this Court addresses each.

The first type of rebuttal "consists of evidence that the reasons given by the employer simply did not happen." *Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 471 (6th Cir.2002). The third type of rebuttal "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct" motivating the termination. *Manzer,* 29 F.3d at 1084. Both are really "direct attacks on the credibility of the employer's proffered motivation for firing the plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.' " *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (U.S. 1993)). "Whether [P]laintiff has in fact presented evidence supporting each ele-

ment of h[is] prima facie case is material to the determination that the employer's articulated reason for the discharge is not credible." *Peters*, 285 F.3d at 472.

■ Here, Agrex has articulated non-discriminatory reasons (poor job performance including the Putian losses) for firing Plaintiff. Plaintiff's evidence casting doubt on Agrex's credibility is: "the loss taken by FGDI was not properly blamed on [Plaintiff]" because he told Fukuchi in November 2008 and January 2009 that the contracts needed to be sold (Doc. 71 at 24). But the problem for Plaintiff is that by then it was too late for FGDI to avoid large losses. FGDI had already lost millions and Mitsubishi had tied Fukuchi's hands, preventing him from selling the contracts until after the investigation was complete.

■ Furthermore, Plaintiff's argument is beside the point. Even if Plaintiff was falsely blamed, employers are free to make mistakes, even foolish, baseless ones, as long as the employer made a reasonably informed decision based on the facts available at the time of the decision. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir.2009). Mitsubishi conducted an investigation into the Putian contracts and determined Plaintiff's failed oversight resulted in a multi-million dollar loss. There is no evidence in the record that the investigation was trumped up, without factual support, or insufficient to warrant termination.

■ That leaves only the second type of rebuttal, whether Agrex's articulated reason was the real reason for Plaintiff's termination. Plaintiff contends that the "circumstantial evidence in this case overwhelmingly demonstrates that discriminatory animus played a role in Plaintiff's termination" (Doc. 71 at 22–23). He argues Fukuchi's repeated requests for a "Japanese trader," his tone and demeanor with Americans, his vote on the predominantly Japanese Managing Committee, and general concerns at FGDI regarding discrimination prove that discrimination was the real reason he was fired. "In other words, [P]laintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084.

Plaintiff overstates the weight of his evidence which, in fact, casts no doubt on Agrex's proffered reason. First, Fukuchi made three requests for a Japanese trader: the first two, in March and April 2008, were both denied; and the third came in April 2009, when Fukuchi noted that FGDI would be able to absorb the loss of Plaintiff and that sales would not be impacted with the addition of "Japanese expatriate staff" (Doc. 64–7 at 5). At least in the short term this request was also denied as Plaintiff's responsibilities were divvied up among existing employees—most of whom were the same nationality and age as Plaintiff.

Second, as for Fukuchi's tone and demeanor, as well as general concerns about discrimination at FGDI, there is no evidence to support such conclusory allegations. Plaintiff cannot point to a single statement made by Fukuchi that was discriminatory and only noted that Fukuchi would "talk down" to Americans (Doc. 54 at 24). This is far too "isolated and ambiguous . . . to support a finding of [ ] discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998) (quotation omitted).

**Mixed–Motive Analysis**

Plaintiff asserts Agrex is liable under a mixed-motive analysis (Doc. 71 at 25–36). Only the claim for national origin discrimination may proceed under this analysis because the race discrimination claims are unexhausted and the mixed-motive frame-

work does not apply to ADEA claims. *See Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 173, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (ADEA claims cannot proceed under a mixed-motive analysis). A mixed-motive claim is one where both legitimate and illegitimate reasons motivated the employer's decision. *White,* 533 F.3d at 396. The *McDonnell Douglas* framework does not apply to mixed-motive claims. *Id.* at 400. Instead, Plaintiff must produce sufficient evidence—either direct or circumstantial—for a jury to conclude that: (1) Agrex took an adverse employment action against him; and (2) race, color, religion, sex, or national origin was a motivating factor for its action. *Id.* at 400.

This burden is not onerous because "[i]n mixed-motive cases, a plaintiff can win simply by showing that the defendant's consideration of a protected characteristic 'was a motivating factor for any employment practice, *even though other factors also motivated the practice.*'" *Id.* at 400–01 (quoting 42 U.S.C. § 2000e–2(m)). Plaintiff need not disprove or rebut Agrex's other legitimate reasons for the termination. Instead, he must only show a genuine issue of material fact "that an illegitimate discriminatory animus *factored* into [Agrex's] decision to take the adverse employment action." *Id.* at 401 (emphasis added). Accordingly, the only question for this Court is whether Plaintiff presents "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that … national origin was a motivating factor" in his termination. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (quoting 42 U.S.C. § 2000e–2(m)). Such inquiries are generally fact intensive and "will typically require sending the case to the jury." *Id.* at 402 (quotation omitted).

■ According to Plaintiff, Fukuchi's requests for a Japanese trader demonstrate that racial animus was at least a motivating factor in Plaintiff's termination. The first of these requests came in March 2008 in an e-mail sent to Agrex's managers (Doc. 64–2). In that e-mail Fukuchi noted that due to the "out flow of human resources" the availability of "superior traders" in the United States has rapidly decreased (Doc. 64–2 at 11) and whether or not Plaintiff was retained at Agrex, "a Japanese trader … will be necessary" (Doc. 64–2 at 12).

The second request came a few weeks later in April 2008 (Doc. 64–4). In that e-mail, Fukuchi explained his request was necessary in the event Plaintiff resigned, to allow some continuity for FGDI and a smooth transition (Doc. 64–4 at 9). In a subsequent e-mail that same day, Fukuchi clarified his position and stated that "the dispatch of a trader who is a Japanese national is a major prerequisite for terminating" Plaintiff, and his termination was "a possible result" of hiring a Japanese trader (Doc. 64–4 at 12).

The final request came nearly a year later in April 2009 when Fukuchi sought final approval to terminate Plaintiff (Doc. 64–7). This request came in the wake of the Putian contracts, and at most was an oblique reference to a Japanese trader. Fukuchi explained that after Plaintiff was fired "we will be able to continue sales operations without any major disruption with the current assistant [Krukemeyer] working as the main person, and with the presence of Japanese expatriate staff … for the long-term" (Doc. 64–7 at 5). Whether "Japanese expatriate staff" refers to the Japanese trader or other Japanese employees is unclear and unexplained.

As explained above, no Japanese trader "replaced" Plaintiff. However, that distinction is irrelevant to the mixed-motive analysis because Plaintiff need not establish his "prima facie case to defeat a motion for summary judgment on a mixed-

motive claim...." *White,* 533 F.3d at 401 (quotation omitted). What is relevant is whether Fukuchi's comments have any connection to the decision to terminate Plaintiff. *See Blair v. Henry Filters, Inc.,* 505 F.3d 517, 525 (6th Cir.2007) ("some degree of connection between the comments and the relevant decision" is required) (overruled on other grounds). Clearly, Fukuchi's request for a "Japanese trader" was connected—by one account a "prerequisite"—to Plaintiff's termination; Fukuchi initially recommended Plaintiff's termination to the Managing Committee; and he had a direct role in Plaintiff's termination.

Fukuchi's statements create a genuine issue of material fact that Plaintiff's termination was, at least in part, motivated by his discriminatory belief that a Japanese national would be superior to Plaintiff. Therefore Plaintiff's national origin claims—though not his ADEA claims—survive under a mixed-motive analysis.

### The FCN Treaty

Agrex argues that even if Plaintiff's claim for national origin survives, the FCN Treaty nevertheless bars such a claim because the treaty permits Japanese-owned companies to fill positions with Japanese expatriates (Doc. 61 at 29–31) (citing *Fortino v. Quasar Co.,* 950 F.2d 389, 391–92 (7th Cir.1991)). Under the FCN Treaty, "foreign businesses clearly have the right to choose citizens of their own nation as executives *because they are such citizens.*" *MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1144 (3d Cir.1988) (emphasis in original). According to Agrex, any alleged discrimination was just that, a preference for Japanese citizens allowed by the FCN Treaty.

■ That argument fails. In *Sumitomo Shoji Am. Inc. v. Avagliano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), the Supreme Court distinguished between subsidiaries incorporated in the United States and branches of Japanese companies merely operating in the United States. The Court noted: "[A] United States corporation, even when wholly owned by a Japanese company, is not a company of Japan under the Treaty...." *Id.* at 183, 102 S.Ct. 2374. At the time of the alleged discrimination, Agrex and FGDI were both subsidiaries incorporated in the United States and not branches of Mitsubishi. For this reason alone, the FCN Treaty does not bar Plaintiff's national origin claim.

Agrex argues, notwithstanding its U.S. incorporation, that if the parent Japanese corporation "exert[s] control and oversight over their subsidiaries" then the FCN treaty may still apply (Doc. 61 at 30) (citing *Fortino v. Quasar Co.,* 950 F.2d 389 (7th Cir.1991)). In the context of discrimination, "a subsidiary may assert the Treaty rights of the parent" if the parent made "all the allegedly discriminatory decisions...." *Papaila v. Uniden Am. Corp.,* 51 F.3d 54, 55 (5th Cir.1995). Here, Agrex has not produced evidence to show that Mitsubishi made "all the allegedly discriminatory decisions." While Fukuchi initially sought approval from Mitsubishi to bring Plaintiff's termination before the Managing Committee, the actual votes were cast by employees at FGDI, Agrex, and FCStone—all United States companies. There is no evidence that Mitsubishi directed Fukushi to request Plaintiff's termination, nor directed any member of the Managing Committee to vote for Plaintiff's termination.

Summary judgment for Agrex on the basis of the FCN Treaty is inappropriate for yet another reason—the Treaty provides Japanese companies immunity from discriminating on the basis of citizenship, not national origin. In the cases cited by Agrex, the courts were careful to distinguish national origin discrimination—prohibited by Title VII—from discrimination

based on citizenship—allowed under the FCN Treaty. *See Fortino*, 950 F.2d at 393 (all the evidence pointed to parent company wanting its own citizens to run its subsidiary); *Papaila*, 51 F.3d at 55 (preferential treatment to Japanese citizens but not to Japanese–Americans evidence of citizenship discrimination allowed). Essentially, the FCN Treaty allows companies to play favorites aboard with their own citizens.

But this case is not about whether Plaintiff was replaced by, or received less favorable treatment than, Japanese citizens. Indeed, Agrex argues Plaintiff was not replaced at all. Instead, this case is about whether, under a mixed-motive analysis, Plaintiff's national origin factored into his termination decision. That is a question to be answered at trial.

### Conclusion

For the foregoing reasons, Agrex's Motion for Summary Judgment is granted in part and denied in part.

Plaintiff's allegations of age and race discrimination are dismissed and, because those claims fail under the federal standard, they also fail under Ohio law. However, as to Plaintiff's national origin claims, Agrex's Motion is denied. This Court notes that if Plaintiff's race claims had been exhausted with the EEOC, the above analysis of Plaintiff's national origin claims would apply equally to Plaintiff's race allegations. Finally, claims for breach of contract, quasi-contract, and unjust enrichment each turn on whether Plaintiff was wrongfully terminated. Since a question of fact exists regarding whether Plaintiff's national origin was a motivating factor in his termination, these state law claims survive Agrex's Motion as well.

IT IS SO ORDERED.